**Robert Moreno RAMOS, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 71,714.**

Court of Criminal Appeals of Texas.

June 26, 1996.

Rehearing Denied Sept. 11, 1996.

Joseph A. Connors, III, Mark Alexander, McAllen, for appellant.

Theodore C. Hake, Asst. District Attorney, Edinburg, Matthew Paul, State's Atty., Austin, for State.

*OPINION*

KELLER, Justice.

At a trial beginning in January 1993, a jury convicted the appellant of committing, on or about February 7, 1992, the capital murder of his wife, Leticia, and his two youngest children, Abigail and Jonathan.[1] The jury answered the punishment issues in the State's favor, and appellant was sentenced to death. Direct appeal to this Court is automatic under Article 37.071 § 2(h).[2] Appellant raises sixty-three points of error on appeal. We will affirm.

### 3. Criminal investigation

In points of error one, two, and four, appellant complains that law enforcement officials illegally obtained evidence. We shall, therefore, recite the events that occurred in connection with the police investigation.

On March 30, 1992, the police arrived at appellant's home to question appellant about his wife and children, whom his wife's sister had reported missing. Appellant voluntarily

---

1. Tex. Penal Code § 19.03(a)(6)(A)(1991) provides that a person commits capital murder when "the person murders more than one person ... during the same criminal transaction."

2. All references to articles refer to the Texas Code of Criminal Procedure unless otherwise indicated.

agreed to accompany law enforcement officials to the police station and later to the sheriff's office. Appellant was given *Miranda* warnings. An interview spanning a few hours was conducted. During that interview, appellant gave conflicting versions of the whereabouts of his family (Austin, San Antonio, Mexico). Appellant also stated that his family was guilty of welfare fraud and that was why they were in Mexico. Sometime during the interview at the sheriff's office, officers discovered some outstanding arrest warrants for appellant on traffic violations. The warrants had been dismissed but, because the justice of the peace's office had failed to notify the sheriff's office of the dismissals, that fact was unknown to the sheriff's office. During the interview, appellant was neither notified of the outstanding traffic warrants nor told that he was under arrest. After the interview was over, appellant was arrested on the traffic warrants. The warrants were never returned to the justice of the peace precinct but were kept as evidence of a felony investigation.

On March 31, 1992, appellant was either committed pending bond or convicted on the traffic warrants.[3] There was no trial to the court and no plea of guilty. The action was taken in a justice of the peace precinct different from the precinct that issued the warrants. On that same date, appellant executed a written consent to search his home. Officers conducted a visual inspection of the home but recovered no useful evidence.

On April 1, 1992, investigator Montemayor conducted an interview with appellant. Appellant's oldest son was present at the interview and spoke with appellant in front of Montemayor. The conversations in this interview essentially duplicated the facts learned in the earlier interview on March 30. Appellant also executed a consent to search his post office box. Later search of the post office box revealed a phone bill and a welfare check.

Appellant was arrested on April 2, 1992, in connection with a theft complaint made by his sister-in-law.

On April 5, 1992, a search warrant, based upon affidavit, was issued to search appellant's home. The warrant authorized a search for the items listed in the affidavit, which was attached. The affidavit listed the following as items to be searched for: "blood, clothing containing blood, a weapon and/or object used in the commission of a murder, and any and all evidence relating to a homicide and/or a kidnapping."

The affidavit contained the following allegations to support probable cause: Blanca Campos (appellant's sister-in-law) had reported Leticia and the two children as missing since February of 1992. Campos swore in an affidavit that she had learned from appellant's uncle that appellant had called his mother and told her that his wife and children were killed in a car accident. A named officer called appellant's mother, and she confirmed that appellant had relayed to her such information. Campos also stated that appellant asked her for $500 to get his oldest son out of jail in Austin. Appellant's oldest son swore in an affidavit that he was not in jail in Austin and never received any money from appellant. Appellant's cousin also swore in an affidavit that appellant told him that Leticia and the children died in a car accident and were cremated by a funeral home.

Two named neighbors swore in affidavits that appellant had mistreated his children. One of the neighbors also stated that she heard Leticia and her children screaming in pain on February 14, 1992 and that the suspected party was hitting and shouting vulgar language at them. Appellant's oldest son also stated that appellant was capable of killing his wife and two younger children due to his brutal behavior.

The probable cause affidavit also cited the interview with appellant on March 30 and the information obtained from that interview. The affidavit concluded with several more observations: The welfare department was not conducting an investigation of the Ramos family. No funeral services on appellant's

---

**3.** Appellant was incarcerated after some kind of action taken by the justice of the peace. The parties dispute the nature of the action taken, but we do not reach this issue due to our disposition of appellant's points of error below.

wife and children had been held in the valley-wide area. Appellant's daughter Abigail had not been withdrawn from school but had been absent since February 10, 1992. Investigators had recovered a welfare check and a phone bill from appellant's post office box. And finally, investigators stated that, after interviewing appellant several times, he was uncooperative and refused to give the location of his family.

The probable cause affidavit concluded with a request that "a complete search be done" and that officers be allowed to "seize any and all evidence relating to a homicide or any other relating crimes."

A search of appellant's house was conducted on April 6, 1992. All items seized either had blood stains or potentially might have had blood stains[4] except three albums and a metal box containing papers. During the search, officers saw two hammers, discovered the sacks of women's and children's clothes and toys in the attic, noticed that the bathroom floor looked newly tiled, and conducted various types of blood testing throughout the house.

On April 7, after being given *Miranda* warnings both orally and in writing, appellant signed a written statement in which he related that he came home on February 7, 1992 to find his wife and children dead and that he had buried the bodies under the bathroom floor.

That day, officers obtained another search warrant, based upon affidavit, to search appellant's home. The search warrant incorporated the affidavit, which was attached. The affidavit requested to search for the bodies of Leticia, Abigail, and Jonathan, giving their first and last names and their dates of birth. The affidavit also requested "any and all evidence relating to a homicide." As probable cause, the second affidavit recited all of the earlier probable cause allegations found in the first affidavit with two additions: (1) the revelations from appellant's written statement of April 7, 1992, and (2) the blood evidence retrieved from the first search. Pursuant to the warrant, officers seized the bodies, two pipe wrenches, two soil samples, a pair of scissors, a ballpeen hammer, broken tile, burnt pieces of rope, a putty knife, a plastic container containing dried cement, tiles, and half of a post hole digger.

### a. First search warrant

In point of error four, appellant complains that the evidence collected pursuant to the first search warrant should be excluded as illegally obtained in violation of Article 18.01, the Fourth and Fourteenth Amendments to the United States Constitution, and Article I, Section 9 of the Texas Constitution. He contends that (1) there was no probable cause to enter the premises, (2) the affidavit does not show probable cause that a specific offense has been committed, (3) the affidavit does not show probable cause that the specifically described property or items to be seized are evidence of the offense, (4) the affidavit does not show probable cause that those items are located at the premises, (5) the affidavit does not give probable cause to search for a weapon, (6) the affidavit does not give probable cause to believe there was a kidnapping, and (7) the phrase "any and all evidence" is overbroad. We shall address each contention in turn.[5]

 Initially, we address appellant's first six arguments that the warrant was not supported by probable cause. Appellant does not dispute the accuracy of the statements contained in the probable cause affidavit; he merely argues that the facts alleged are not sufficient. Whether the facts alleged

---

4. Not listed as containing blood stains were: a multicolored curtain, a brown colored boot, a yellowish colored blanket from one of the bedrooms, a red sponge, a pair of brown boots, a piece of wood from a door from one of the bedrooms, and some burnt towels. Listed as having blood stains were: two pieces of sheetrock, one from a bedroom wall and one from the hallway wall, and a door hinge to one of the bedrooms.

5. Appellant does not explain how the protection offered by the Texas Constitution differs from that of the United States Constitution. We decline to make appellant's arguments for him. Therefore, we will not address the application of the Texas Constitution to appellant's claims. Johnson v. State, 853 S.W.2d 527, 533 (Tex. Crim.App.1992), *cert. denied,* 510 U.S. 852, 114 S.Ct. 154, 126 L.Ed.2d 115 (1993).

in a probable cause affidavit sufficiently support a search warrant is determined by examining the totality of circumstances. *Illinois v. Gates*, 462 U.S. 213, 228–229, 103 S.Ct. 2317, 2326–27, 76 L.Ed.2d 527 (1983). The allegations are sufficient if they would "justify a conclusion that the object of the search is probably on the premises." *Cassias v. State*, 719 S.W.2d 585, 587 (Tex.Crim. App.1986). The magistrate is permitted to draw reasonable inferences from the facts and circumstances alleged. *Id.* at 587–588. *Gish v. State*, 606 S.W.2d 883, 886 (Tex.Crim. App.1980). Reviewing courts should accord great deference to the magistrate's determination. *Bower v. State*, 769 S.W.2d 887, 902 (Tex.Crim.App.1989), *cert. denied*, 492 U.S. 927, 109 S.Ct. 3266, 106 L.Ed.2d 611 (1989), *overruled on other grounds, Heitman v. State*, 815 S.W.2d 681 (Tex.Crim.App.1991).

█ The affidavit showed that the victims had been missing for more than a month and that appellant had told some relatives that the victims had died in a car accident. It also showed that appellant did not acknowledge to the police that the victims were dead but gave conflicting accounts as to their whereabouts. Appellant had apparently lied about holding a funeral for his family. Moreover, appellant had apparently concocted a false welfare fraud story to explain his family's disappearance. Neighbors and appellant's oldest son indicated that appellant had a history of violence against his family. Appellant's oldest son characterized appellant as brutal and capable of killing his family. At about the time of the family's disappearance, a neighbor heard Leticia and the children screaming in pain and heard appellant hitting and shouting vulgar language. We believe that these facts were sufficient for the magistrate to conclude that there was probable cause to believe that appellant had murdered his family and that the evidence sought would be found in appellant's home.[6]

As for the contention that there was no probable cause to search for a weapon, the magistrate could reasonably infer that the murder, or at least some of the events connected with the murder, occurred in appellant's home. Hence, there was probable cause to believe that the murder weapon would be in the home. As for the argument that there was no probable cause to believe that a kidnapping took place, there was probable cause to believe that either a murder or a kidnapping took place. Appellant had told various stories about the whereabouts of his family, and no funeral services had occurred. There was some possibility, then, that his family might still be alive. If a murder had not taken place, then kidnapping was a likely alternative. We find that the magistrate had sufficient evidence of the alleged crimes to issue the warrant.

█ In the seventh contention, appellant complains that the affidavit, which the warrant incorporates, fails to adequately describe the property to be seized. He contends that the phrase "any and all evidence" does not properly identify what may be seized. We will assume that the clauses containing the phrase "any and all evidence" were improper. We address the question of whether this defect renders the warrant invalid as a whole. In *Walthall v. State*, 594 S.W.2d 74, 79 (Tex.Crim.App.1980), we adopted a rule of severability by which invalid portions of a warrant are severable from the valid portions.[7] Under this rule, the search and seizure of items listed under the valid portions of the warrant is lawful. The appropriate remedy here, then, is not to suppress the fruits of the entire warrant but to strike the offending clauses and exclude evidence that does not fit within the warrant as modified. *Id.* The warrant specified blood and clothing containing blood among the items to be searched. After reviewing the record, we conclude that the only items taken

---

6. Appellant's second, third, and fourth contentions refer to the various probable cause requirements for evidentiary search warrants outlined in Article 18.01(c). We agree that the first search warrant is properly characterized as evidentiary, but we believe that the above discussion of probable cause adequately addresses these arguments.

7. Invalid portions of a warrant that is essentially general in character but as to minor items meets the requirement of particularity are not severable under this rule. *Id.*

pursuant to the warrant that proved useful to the investigation or at trial were items containing blood stains. Therefore, even if the offending clauses were stricken from the warrant, we find any error relating to items seized (to the extent that any were admitted into evidence) to be harmless beyond a reasonable doubt.

Finally, some evidence was discovered but not seized during the search pursuant to the first warrant. For example, officers found the sacks of clothes and toys in the attic and discovered that the closets contained only men's clothes. Investigators noted the condition of the house, such as the newly-tiled bathroom floor, and they saw hammers and other equipment around the house. Photographs of these and other items were taken. Since officers had a legal right to be on the premises to search for blood evidence, evidence of their observations (and photographs taken) during this search was admissible. *Brown v. State,* 856 S.W.2d 177, 182–183 (Tex.Crim.App.1993)(police who are present in home legally may search purse in plain view where suspect stated that victim had been killed by someone else because her purse was gone). Point of error four is overruled.

### b. *Second search warrant*

In point of error two, appellant contends that the second search warrant was invalid because it constituted a second evidentiary warrant in violation of Article 18.01(d). At the time of the search, that statute prohibited the issuance of a second warrant under subsection (10) of Article 18.02. Subsection (10) authorizes a search for:

> property or items, except the personal writings by the accused, constituting evidence of an offense or constituting evidence tending to show that a particular person committed an offense.

The language "any and all evidence relating to a homicide," in the affidavit supporting the second warrant, clearly constitutes an attempt to conduct a second evidentiary search. But, the second affidavit also requested a search for and seizure of the victims' bodies. If the bodies fall within one of the other categories for issuing a search warrant, then pursuant to *Walthall,* the impermissible parts of the warrant would be severed, and the evidence would be examined in light of the remaining portions.

One of the other categories is "persons" listed in Article 18.02, Subsection (11). The question is whether the bodies of dead persons qualify as "persons" under this subsection. When a statute is clear and unambiguous, we apply the plain meaning of its words. *Boykin v. State,* 818 S.W.2d 782, 785–786 & 786 n. 4 (Tex.Crim.App.1991). But, when the words are ambiguous or uncertain, we may look to extratextual factors to attempt to ascertain the statute's meaning. *Id.* The word "persons" in Article 18.02 does not appear to have a clear and unambiguous meaning. We therefore resort to extratextual factors to ascertain its meaning.

The legislature has given some guidance as to the factors we may examine in construing the statute. We may consider, among other matters, the

(1) object sought to be attained;

(2) circumstances under which the statute was enacted;

(3) legislative history;

(4) common law or former statutory provisions, including laws on the same or similar subjects;

(5) consequences of a particular construction;

(6) administrative construction of the statute; and

(7) title (caption), preamble, and emergency provision.

Tex. Gov't.Code, § 311.023.[8] After examining the circumstances under which the statute was enacted, the legislative history, the title, preamble, and emergency provision, we find

---

8. This provision is part of the "Code Construction Act," which applies to the Code of Criminal Procedure, at least to the extent it has been amended or reenacted by the 60th or subsequent legislature. Tex. Gov't Code § 311.002(2). *Pos-* *tell v. State,* 693 S.W.2d 462, 464 (Tex.Crim.App. 1985). *Barbee v. State,* 432 S.W.2d 78, 82 (Tex. Crim.App.1968), *cert. denied,* 395 U.S. 924, 89 S.Ct. 1779, 23 L.Ed.2d 241 (1969).

no information relevant to the question before us. We are not aware of any administrative constructions of the statute relevant to our inquiry. Nor are we aware of the existence of any common law or former statutory provisions which would shed light on the meaning of "persons." We will therefore attempt to ascertain the object sought by the statute and the consequences of a particular construction. *See Burgess v. State*, 816 S.W.2d 424, 430 (Tex.Crim.App.1991).

To determine the object sought by the "persons" subsection, it is helpful to examine other subsections. Subsection (1) permits issuance of a warrant for "property acquired by theft or in any other manner which makes its acquisition a penal offense." This provision appears designed to permit a search for the fruits of a crime. We think the "persons" provision may serve a similar function. For instance, it would clearly permit a warrant to be issued to search for kidnapping victims who are still alive. In both kidnapping and murder, the human victim is the "fruit" of the criminal activity.

 An examination of the consequences of limiting the scope of the "person" provision to live persons favors interpreting the provision more expansively. Such limitation would have the paradoxical effect of conferring greater protection upon one who murders his victims than upon one who holds his victims alive for ransom. Accordingly, we hold that the term "persons" in Article 18.02(11) refers to both the living and the dead. Hence, the second search warrant was valid insofar as it authorized a search for the victims' bodies.

 Although law enforcement officials also seized other evidence pursuant to the second warrant, such evidence was lawfully seized if it met the requirements of the "plain view seizure" doctrine. The doctrine requires that: (1) law enforcement officials have a right to be where they are, and (2) it must be immediately apparent that the item seized constitutes evidence (that is, there is probable cause to associate the item with criminal activity). *State v. Haley*, 811 S.W.2d 597, 599 (Tex.Crim.App.1991). *Stoker v. State*, 788 S.W.2d 1, 9 (Tex.Crim.App. 1989), *cert. denied*, 498 U.S. 951, 111 S.Ct.

371, 112 L.Ed.2d 333 (1990). Discovery of the seized item need not be inadvertent. *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). *Haley*, 811 S.W.2d at 599.

 The soil samples and broken tile recovered from the bathroom clearly meet the requirements. One of the pipe wrenches was found in the front yard; the other was found on the kitchen stove. The evidence shows that officers walking through the front door would have had to pass the kitchen in order to reach the bathroom. Some tile, burnt pieces of rope, and the post digger were found on the sides of the yard outside the house. The trial court could have concluded that officers saw these items as they were approaching appellant's house and walking through it to the bathroom. Armed with the knowledge that bodies had been buried, officers could have seized these items as evidence of the crime.

The ballpeen hammer and putty knife were found in one of the bedrooms. Upon seeing these items police could have immediately believed that they were connected with the burial of the bodies. Examination of the bodies may also have reasonably led officers to believe that the hammer was a potential murder weapon.

 While the bedrooms were behind the bathroom and thus not along the pathway between the bathroom and the front door, we believe that the officers at least had the right to walk through the entire house to determine that it was secure from possible intruders. We have recognized that an officer may conduct a cursory search of a hotel room for the purpose of securing the premises and may seize evidence discovered in plain view. *Vuong*, 830 S.W.2d at 939. In *Vuong*, an officer was admitted by consent into a hotel room after responding to a disturbance call. *Id.* at 938. The officer then went to the bathroom to make sure that no one else was occupying the premises, and he there discovered evidence of illegal narcotics in plain view. *Id.* at 938–939. Similarly, the United States Supreme Court has recognized that, after a lawful entry under the "emergency" doctrine, officers may conduct a search for

other victims or for the killer and may seize evidence discovered in plain view during such activities. *Mincey v. Arizona*, 437 U.S. 385, 392–393, 98 S.Ct. 2408, 2413–14, 57 L.Ed.2d 290 (1978). In the present case, we believe that the officers could conduct a cursory examination of the bedrooms to secure the residence and that they could seize the evidence seen during that examination.

That leaves the scissors, some tiles other than those found in the bathroom and outside, and a plastic container containing dried cement. The scissors and the tiles do not appear to have been admitted into evidence. As for the plastic container with dried cement, it merely tends to indicate that appellant retiled the bathroom floor, a fact which was apparent from many other sources, such as the broken tile discovered on the side yard and the investigators' observation that the bathroom floor looked newly tiled. Any error connected with the admission of the plastic container is harmless beyond a reasonable doubt.

Moreover, even if all of the evidence except the bodies were found to be erroneously seized, such error would nevertheless be harmless. With the possible exception of the hammer and the wrenches, the only value of these items would be to support the contention that appellant uncovered the bathroom floor through digging, buried the bodies, and then retiled the floor. In his written statement, appellant admitted to this conduct. This admission was corroborated by the fact that the bodies were later found where appellant said they would be found. Given this evidence, there was no real need for the circumstantial proof of appellant's conduct that these items represented.

While the hammer and wrenches may also be considered potential weapons, none of these items responded to blood testing. By contrast, a hammer found at the Robledo residence, the search of which appellant does not contest, did respond to blood testing. Moreover, to the extent that the ballpeen hammer is valuable merely because it is known to exist, its existence was established by testimony that it had been observed in the house pursuant to the first search warrant executed on April 6. Thus, the admission of these items was harmless beyond a reasonable doubt. Point of error two is overruled.

### 4. Jury selection

In points of error twenty-seven, twenty-eight, and thirty-nine through fifty-seven, appellant challenges the "death-qualification" scheme as unconstitutional under the Due Process and Equal Protection clauses of the Fourteenth Amendment, the rights under the Sixth Amendment to an impartial jury and the effective assistance of counsel, the Eighth Amendment proscription against cruel and unusual punishment, and comparable provisions in the Texas Constitution.[9] Appellant lists five prospective jurors who were dismissed due to their opposition to the death penalty: Garcia, Mingus, Suarez, Ramirez, and Lozano. He concedes that they were objectionable under the applicable Texas statute.[10] The Texas statute is a ground for disqualification only to the extent constitutionally permitted by *Witt. Cuevas v. State*, 742 S.W.2d 331, 334 (Tex.Crim.App.1987), *cert. denied*, 485 U.S. 1015, 108 S.Ct. 1488, 99 L.Ed.2d 716 (1988). Appellant does not argue that the prospective jurors are qualified under *Witt*; instead, he attacks the constitutionality of the *Witt* standard itself. Appellant makes six basic arguments against the standard: (1) it violates the right under the Sixth Amendment to a fair cross-section of the venire, (2) it "stacks the deck" in favor of the government, (3) it produces a "conviction prone" jury, (4) it denies the right to jury nullification, (5) it denies equal protection

---

9. In many of appellant's arguments, where he claims a violation of the Texas Constitution, he does not claim that the Texas Constitution confers broader protection than the United States Constitution. Therefore, we will *address his* state constitutional arguments only to the extent that he claims the Texas constitution confers more protection. *See* footnote 5.

10. Article 35.16(b)(1), which states:

That the juror has conscientious scruples in regard to the infliction of the punishment of death for crime, in a capital case, where the State is seeking the death penalty.

and due process by discriminating against people on the basis of religious beliefs, and (6) it infects the venire with prejudice against anti-death penalty views.

The Supreme Court has ruled that jurors challengeable under *Witt* do not constitute a distinct class, and therefore, there is no violation of fair cross-section rights. *Lockhart v. McCree*, 476 U.S. 162, 173–177, 106 S.Ct. 1758, 1764–65, 90 L.Ed.2d 137 (1986). *Buchanan v. Kentucky*, 483 U.S. 402, 414–416, 107 S.Ct. 2906, 2913–14, 97 L.Ed.2d 336 (1987). We have adopted the Supreme Court's position under the Texas Constitution. *Marquez v. State*, 725 S.W.2d 217, 241–243 (Tex.Crim.App.), *cert. denied*, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987)(adopting *McCree* ). *Hathorn v. State*, 848 S.W.2d 101, 109–110 (1992), *cert. denied*, U.S. , 509 U.S. 932, 113 S.Ct. 3062, 125 L.Ed.2d 744 (1993). As for the argument that the *Witt* standard "stacks the deck," in the same cases, the Supreme Court rejected similar arguments. *McCree*, 476 U.S. at 177–183, 106 S.Ct. at 1767–70 (rejecting argument that jury is slanted in favor of conviction because it fails to achieve a balance of people with various predispositions). *Buchanan*, 483 U.S. at 416–421, 107 S.Ct. at 2914–17.

 Regarding the claim that the *Witt* standard creates a "conviction prone" jury, the Supreme Court has held that the burden is on the defendant to show that the exclusion of jurors based upon anti-death penalty beliefs produces a jury unduly disposed to convict. *Witherspoon v. Illinois*, 391 U.S. 510, 517–518, 88 S.Ct. 1770, 1774–75, 20 L.Ed.2d 776 (1968). *Bumper v. State of North Carolina*, 391 U.S. 543, 545, 88 S.Ct. 1788, 1789–90, 20 L.Ed.2d 797 (1968). Appellant contends that the burden was met in *Grigsby v. Mabry*, 483 F.Supp. 1372 (E.D.Ark.1980), but *Grigsby* was one of the cases on direct review in *McCree*, and the Supreme Court criticized the studies upon which the parties relied. *McCree*, 476 U.S. at 165 & 168–173, 106 S.Ct. at 1760–61 & 1762–65. Appellant argues that we should adopt Justice Marshall's dissent in *McCree* as Texas Constitutional law. Appellant fails to specify the provision of the Texas Consti-

tution to which he refers. Moreover, having already adopted the majority analysis in *McCree* as it relates to the fair cross-section requirement, we see no reason to depart from its reasoning on the "conviction prone" argument. Finally, appellant has not himself produced any evidence supporting the argument that *Witt*-qualified juries are "conviction prone." Even if we wished to conduct an independent analysis of the studies in this area, they are not before us.

 As for the so-called right to jury nullification, the sources cited by appellant concede that the jury is not expected to nullify the trial court's instructions; it merely has the ability to do so if it wishes. The jury has the power to nullify, but the appellant does not have the right to a jury who will nullify. The Supreme Court has expressly stated that "nullifiers" may constitutionally be excluded from the jury. *McCree*, 476 U.S. at 172, 106 S.Ct. at 1764.

 Appellant argues that excusing prospective jurors under *Witt* violates their due process and equal protection rights because many religious denominations are opposed to the death penalty, and therefore, the prospective jurors are being struck on account of their religious beliefs. This argument is flawed in several respects. First, the *Witt* standard is not directed at religious beliefs; it is a neutral standard designed to ensure that the jurors who decide capital cases are able to follow the law. Religious freedoms are not implicated by neutral laws governing activities the government has the right to regulate merely because some religious groups may be disproportionately affected. *Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)(law criminalizing possession of the drug peyote which is used in some religious practices). *Johnson v. Robison*, 415 U.S. 361, 375 n. 14 & 385, 94 S.Ct. 1160, 1169 n. 14 & 1174–75, 39 L.Ed.2d 389 (1974)(law limiting class of people entitled to certain military benefits to active duty personnel; exclusion of conscientious objectors does not violate equal protection on the basis of religious belief). In *Johnson*, the Supreme Court held that the exclusion of conscientious objectors from benefits placed only an incidental bur-

den upon the exercise of religion, if any at all. *Id.* at 385, 94 S.Ct. at 1174–75. Prospective jurors excluded under *Witt* are, as a class, in a very similar situation. Moreover, "[t]he mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities." *Smith* 494 U.S. at 879, 110 S.Ct. at 1600. The government has the right to expect jurors to follow the law in capital cases, and prospective jurors who wish to serve on capital juries must be able to do so. Further, appellant produces no evidence that the prospective jurors challenged are members of religious groups who oppose the death penalty.

The Supreme Court's analysis in *McCree* also shows why the equal protection argument is flawed. The Court indicated that prospective jurors excludable under *Witt* are different from the classes of prospective jurors to which equal protection has been held to apply (blacks, women, and Mexican–Americans). *McCree*, 476 U.S. at 175–176, 106 S.Ct. at 1765–67. Three observations could be made about the common characteristics of these classes: (1) the common characteristic is unrelated to the ability to serve as a juror in the particular case, (2) the common characteristic is immutable, and (3) the groups sharing the characteristics are historically disadvantaged. *Id.* These observations do not apply to *Witt*-excludables. *Id.*

Moreover, we have recently held that *Batson* equal protection concerns do not apply to peremptory challenges of prospective jurors on the basis of religion. *Casarez v. State*, 913 S.W.2d 468, 472–74 (Tex.Crim.App.1995) (op. on rehearing). This is in part because the interests involved are sufficiently compelling to justify discrimination on the basis of religious belief. The State's interest is much more compelling in the present case where the prospective jurors involved cannot follow the law (as opposed to merely being undesirable). Moreover, the connection of *Witt* er-

ror to religion is indirect at best. We find no federal due process or equal protection violations.

Appellant argues that the Texas Constitution's equal protection clauses, Article I, Sections 3 and 3a, should be interpreted as to confer more protection because they are affirmatively and forcefully worded.[11] Appellant gives no explanation as to the nature of the greater protection that the difference in wording would justify. The Texas Supreme Court has held that the "Equal Rights Amendment" (section 3a) elevates sex to a suspect classification. *In the Interest of McLean*, 725 S.W.2d 696, 698 (Tex.1989). This elevation is based upon the theory that all categories listed in the amendment were meant to be subjected to strict scrutiny. *Id.* However, the Texas Supreme Court has also held that categories already subjected to strict scrutiny under the federal constitution are given no additional protection under Section 3a. *Richards v. LULAC*, 868 S.W.2d 306, 311 n. 3 (Tex.1993).

While the categories listed in Section 3a are suspect classifications, none of those categories are implicated in the present case. Presumably, "creed" is a suspect classification under the Equal Rights Amendment. Without deciding the entire extent of meaning of "creed," the word at least signifies common beliefs. Even under this minimal definition, the *Witt* rule does not discriminate on the basis of belief: Prospective jurors are not excluded because they are against the death penalty; they are excluded because they cannot follow the law. Prospective jurors who oppose the death penalty but would follow the law and honestly answer the special issues are not challengeable. *Riley v. State*, 889 S.W.2d 290, 296 (Tex.Crim. App.1993).

Moreover, even if creed or religion were implicated, we have already noted above that the *Witt* standard is justified by compelling state interests. The Equal Rights Amendment places no heavier burden on the State.

---

11. Article I, Section 3 provides:
All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services.

Article I, Section 3a provides:
Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin. This amendment is self-operative.

■ Appellant's final argument under these points of error is that the death-qualification process infects the jury with prejudice against anti-death penalty views. We disagree. The State of Texas has decided, as a matter of policy, that the death penalty is a valid punishment for certain crimes. The *Witt* standard does not prevent jurors from disagreeing with that policy but merely impresses upon them their duty to follow the law as it exists. Points of error twenty-seven, twenty-eight, and thirty-nine through fifty-seven are overruled.

### d. *Discharged juror*

■ In point of error seven, appellant complains of the trial court's discharge of a juror after the jury had been selected. Voir dire of venireman Blanco ended on January 13, 1993, and he was seated, without objection from either side, as the first juror in the case. Voir dire of the entire panel ended on February 11, 1993, at which time the trial judge recessed the trial until February 18, 1993, the date on which testimony was to begin.

On February 18, Blanco came forward and told the trial court that he was starting a new job in Houston. He stated that he had been led to believe the trial would be over by the end of February. He informed the court that he had already given notice to leave his apartment by February 28 and that he was required to start his job on March 1 or lose it. Blanco testified that remaining in McAllen would pose an economic hardship and that his ability to concentrate would be affected. He stated that he would be constantly looking at the calendar as the trial progressed. He said that his service as a juror would be impaired because of his mental and emotional concerns relating to the move and his employment. Upon further questioning he testified that he did not have a clear mind because of these concerns, and he could not follow his oath and do his duty as a juror. Finally, upon questioning by the Court, he said that his changed circumstances would impair his ability to serve on the jury. He said that he considered himself mentally and emotionally disabled to serve. He was discharged by the trial court over appellant's objection.

Appellant contends that the trial court's action was improper for two reasons: (1) that the juror suffered no physical illness or mental state permitting excusal under Article 36.29, and (2) that the juror was improperly excused for economic hardship without the consent of both parties, *see* Government Code § 62.110(c).

A juror who "dies or becomes disabled from sitting" during trial may be replaced by an alternate. Article 36.29(b). We have traditionally interpreted "disabled from sitting" as involving "physical illness, mental condition, or emotional state which hinders one's ability to perform one's duties as a juror." *Landrum v. State*, 788 S.W.2d 577, 579 (Tex.Crim.App.1990). *Carrillo v. State*, 597 S.W.2d 769, 770–771 (Tex.Crim.App.1980). We have also defined the term "disabled" to mean any condition that inhibits the juror from fully and fairly performing the functions of a juror. *Griffin v. State*, 486 S.W.2d 948, 951 (Tex.Crim.App.1972). This Court has upheld a judge's decision to excuse a juror for disability who was emotionally upset over the death of his father-in-law and needed to go out of state to be with his wife. *Clark v. State*, 500 S.W.2d 107 (Tex.Crim.App.1973).

In the present case, there is evidence in the record that Blanco would be unable to concentrate due to the time pressures associated with moving and starting a new job. We have held that emotional pressures due to an illness in the family will justify discharge under Article 36.29. *Carrillo*, 597 S.W.2d at 770. Likewise, the emotional pressures suffered by Blanco justify the trial court's decision to discharge him. Moreover, because Blanco was properly discharged pursuant to Article 36.29, he was not excused for an economic reason. Point of error seven is overruled.

CLINTON, J., concurs in the result.

BAIRD, J., took no part in the consideration of or decision of this case.

OVERSTREET, J., dissents to the disposition of point of error number 6.