Affirmed and Opinion filed May 21, 2009








Affirmed
and Opinion filed May 21, 2009.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-08-00037-CR

____________

 

OLUWOLE AJAYI GABRIEL, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 240th
District Court 

Fort Bend County, Texas

Trial Court Cause No. 43606

 



 

O P I N I O N








A jury found appellant guilty of theft of $200,000.00 or
more and the trial court assessed punishment at forty-five years= confinement in
the Texas Department of Criminal Justice Institutional Division.  Appellant
raises four issues on appeal.  In his first three issues, appellant contends
the trial court erred in denying his motion to suppress because (1) evidence
was obtained in violation of his Fourth Amendment rights when police officers
conducted a warrantless search of garbage left outside his residence, (2)
evidence was obtained in violation of his Fourth Amendment rights when police
officers conducted a warrantless search of his private postal box, and (3) the
search warrant issued to search his residence and vehicles was not supported by
probable cause and therefore the search violated his Fourth Amendment rights. 
In his fourth and final issue, appellant contends the trial court erred in
overruling his motion for a directed verdict on the issue of venue and
furthermore, the jury=s verdict is not supported by a
preponderance of the evidence on the issue of venue.  Finding no error, we
affirm.  

Factual and Procedural Background

This appeal arises from an elaborate scheme of theft
primarily involving the use of fraudulently obtained credit cards.  Over the
course of approximately nine months, appellant submitted credit card
applications to J.P. Morgan Chase Credit Services using phony names and fake
social security numbers.[1] 
Upon receiving the false applications, Chase would issue a credit card and
create an account based on the false name and social security number. 
Appellant  used various addresses, including some postal boxes, as the home
address on the application.  Appellant would then receive the credit cards in
the mail and would use them to make cash withdrawals, purchases, and balance
transfers to other false accounts.  Appellant rarely paid off the credit cards
and when he did, he used a bad check, which was subsequently dishonored by the
issuing bank.  Appellant had numerous accounts open at one time and was
constantly applying for and opening new accounts, while other accounts were
being closed off as a loss by Chase.  In the end, Chase calculated its loss
from the fraudulent accounts as somewhere over $200,000.00.   








This web of theft was discovered when analysts at J.P.
Morgan Chase Credit Services noticed a trend of credit card fraud involving
multiple accounts.  The Senior Regional Investigator for J.P. Morgan Chase,
Russell Locke, was alerted of the trend and took over the investigation.  Locke
testified the trend originally involved approximately forty accounts suspected
of being fraudulent, all linked by common factors.  The analysts initially became
suspicious of the accounts when they determined  many of the names on the
accounts did not match up with the social security numbers on the accounts. 
Locke began further investigation on the accounts and found they were all
linked to various addresses in Katy, Bedford, Dallas, and Fort Worth, Texas. 
Locke compiled a report including the names of the card holders on the
suspicious accounts, the information on the applications for the accounts, and
statements showing transactions conducted on each account.  The majority of the
transactions were either balance transfers or cash advances made at ATM
machines.  Many of the accounts included in the report were registered to
similar names, often varying between different first letters of similar last
names or different combinations of the same first and last names. 
Additionally, at least thirty of the forty suspicious accounts had been Acharged off@ as a loss by
Chase.  Locke testified that a Aloss account@ is an account on
which payments have stopped and the financial institution is  forced to close
the account at a loss. 

Upon further investigation, Locke discovered approximately
forty more loss accounts linked with the original trend.  Additionally, a
single telephone number was traced to thirty separate accounts by a computer
program that captures a caller=s telephone number when a balance inquiry
is made on an account.  One of the accounts linked to the telephone number was
registered under appellant=s name and the suspicious telephone number
was listed as his home telephone number.  Ultimately, J.P. Morgan Chase
suffered a loss of $306,357.46 over a period of nineteen months.  Sometime in
December 2005, Locke turned his reports over to Detective David Schultz of the
Fort Bend County Sheriff=s Office.[2]  
    








Detective Schultz is the Sergeant of the Organized Crime
Unit in the Fort Bend County Sheriff=s Office and in
that role he supervises the financial crimes section.  When Detective Schultz
received Locke=s report, he immediately noticed four of the addresses
in the report were located in Fort Bend County.  One of the four Fort Bend
County addresses was identified as a commercial mail receiving agency,  known
as The UPS Store.  Detective Schultz went with two of his partners and a U.S.
Postal Inspector, Robert Fisher, to The UPS Store to determine who was
registered on the postal boxes.  At The UPS Store they looked at the applications
for postal boxes #510 and #429, two of the postal boxes identified in the
report compiled by  Locke.  One of the boxes was registered to appellant and
the other to his wife. 

While at The UPS Store, Fisher obtained permission from The
UPS Store manager to make xerox copies of the outside of the mail in appellant=s postal box.  The
names of the addressees on the mail were the same names listed on the
fraudulent Chase accounts.  The mail was not opened by Detective Schultz or any
of the other investigators.  After making copies of the face of the mail, the
mail was returned to appellant=s postal box.  The parties stipulated
during the suppression hearing that The UPS Store was set up so the manager and
employees of the store had unfettered access to the back of the postal boxes,
while the front of the postal boxes could only be opened by a key which is
given to the renter.  It is not clear from the record whether the mail was retrieved
from the back or front of the postal box, but it does not appear anyone other
than appellant or his wife had a key to the postal box.   








Detective Schultz used the name on the postal box
applications to conduct a search in the Fort Bend County property records.[3] 
Eventually, Detective Schultz identified a residence in Fort Bend County owned
by Gabriel A. Michaels, a variation of appellant=s name and one of
the names used on the fraudulent accounts.  The address of the residence was
also one of the addresses connected with the fraudulent accounts.  Detective
Schultz and the other officers working on the case decided to conduct
surveillance on the residence and a trash pickup.  After a month of
surveillance on the residence, the detectives determined appellant, his wife,
and three children were the occupants of the residence.  Additionally, the
detectives observed three vehicles at the residence, a Nissan Armada, a black
Mercedes, and a champagne colored Lexus.  When Detective Schultz ran a license
plate check on the vehicles he found they were registered to: Gabriel O. Ajayi,
Gabriel O, Ajayi, and Gabriel A. Michaels, respectively.  

Detective Schultz decided to contact J.P. Morgan Chase Bank
and Bank of America, to determine whether they had photos or videos from their
ATM machines that could have recorded the individual using the fraudulent
credit cards.  Both banks were able to find the videos from the specific
fraudulent transactions and forwarded them to Detective Shultz.  The videos
displayed a man similar in appearance to appellant in vehicles similar to the
vehicles identified as belonging to appellant.  These photos supported
Detective Schultz=s belief appellant was the orchestrator of
the fraudulent scheme. 

In January 2006, two trash pickups were conducted at
appellant=s Fort Bend residence.  The garbage collection crew
along with one Fort Bend County detective collected appellant=s trash from its
ordinary location outside appellant=s home. After the
trash was collected from appellant=s home it was
unloaded from the garbage truck and placed in an unmarked police vehicle to
transport back to the police station for inspection.  At the station, the detectives
found three shredded credit cards, one being a Chase card connected with the
fraud scheme. They also found numerous pre-approved offers from credit card
companies, letters of correspondence from credit card companies, and credit
card statements all addressed to the names on the fraudulent accounts.  These
documents were entered into evidence at appellant=s trial.     








Three days after the trash pickup Detective Schultz
prepared an affidavit to obtain a search warrant for appellant=s residence and
vehicle.  Detective Schultz explained in great detail every step of the
investigation leading him to appellant, his residence, and his vehicles.  The
magistrate issued the search warrant and the Fort Bend County Sheriff=s office timely
executed it.  Inside the house they found documents identifying appellant and
his wife, such as passports, identification cards, and driver=s licenses. The
detectives also found checkbooks in different names, credit cards in different
names, many of the names matching those of the fraudulent Chase accounts. 
There was also an empty checkbook with check stubs showing checks written to
names matching those names on the fraudulent accounts.  Additionally, spiral
notebooks were found with hand written information appearing to pertain to
credit card accounts.  There were names, dates of birth, pin numbers, account numbers,
social security numbers all spanning numerous notebooks.  Much of the
information found in the notebooks matched up with the Chase fraudulent
accounts. 

Appellant was charged with aggregated theft of $200,000.00
or more.  The jury found appellant guilty as charged in the indictment.  The
trial court set his punishment at forty-five years= confinement. 
This appeal followed.  

Discussion 

I.  Did
the Trial Court Err in Denying Appellant=s Motion to Suppress?

Appellant
argues the trial court erred in denying his motion to suppress evidence seized
from a search of his garbage, a search of his private postal box, and a search
of his residence and vehicles pursuant to a search warrant.  Specifically,
appellant contends the warrantless searches of his garbage and private postal
box were in violation of his Fourth Amendment rights.  He also contends the
search of his home and vehicles violated his Fourth Amendment rights because
the search warrant was not supported by probable cause.  

 








A.        Standard of Review 

We
review a trial court=s decision to grant or deny a motion to suppress under an
abuse of discretion standard.  Villarreal v. State, 935 S.W.2d 134, 138 (Tex.
Crim. App. 1996).  At a
suppression hearing, the trial judge is the exclusive trier of fact and judge
of the credibility of the witnesses.  See id.  An appellate court
affords almost total deference to a trial court=s determination of the historical
facts supported by the record, especially when the trial court=s fact findings are based on an
evaluation of credibility and demeanor.  Guzman v. State, 955
S.W.2d 85, 89 (Tex. Crim. App. 1997).  The appellate court also affords the
same amount of deference to a trial court=s ruling on Aapplication of law to fact questions,@ also known as Amixed questions of law and fact,@ if the resolution of those questions
turns on an evaluation of credibility and demeanor.  Id.  An
appellate court must view the record evidence and all reasonable inferences
therefrom in the light most favorable to the trial court=s ruling, and must sustain the trial
court=s ruling if it is reasonably
supported by the record and is correct on any theory of law applicable to the
case.  Villarreal, 935 S.W.2d at 138.  This court reviews de novo those
questions not turning on credibility and demeanor.  Guzman, 955 S.W.2d
at 89.

B.        Analysis 

The
critical question in determining a suppression issue is whether the criminal
defendant had a legitimate expectation of privacy in the area searched or items
seized.  See Rakas v. Illinois, 439 U.S. 128, 140, 99 S.Ct. 421, 429, 58
L.Ed.2d 387 (1978).  The capacity to claim the protection of the Fourth
Amendment depends not upon a property right in the invaded place, but upon
whether the person who claims the protection of the Amendment has a legitimate
expectation of privacy in the invaded place.  Id. at 143, 99 S.Ct, at
430. 








The
accused, because he has greater access to the relevant evidence, has the burden
of proving facts establishing a legitimate expectation of privacy.  Villarreal,
935 S.W.2d at 138.  To carry this burden, the accused must normally prove: (a)
that by his conduct, he exhibited an actual subjective expectation of privacy,
i.e., a genuine intention to preserve something as private; and (b) that
circumstances existed under which society was prepared to recognize his
subjective expectation as objectively reasonable.  Id. (citing Smith
v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220
(1979)). 

1.         The trial court did not
err in denying appellant=s motion to suppress evidence seized
from appellant=s garbage. 

In his
first issue, appellant argues the trial court erred in denying his motion to
suppress evidence seized from his garbage.  The United States Supreme Court has
held individuals cannot reasonably claim an expectation of privacy in trash
left for collection.  California v. Greenwood, 486 U.S. 35, 40-42, 108
S.Ct. 1625, 1628-29, 100 L.Ed. 30 (1988); Nilson v. State, 106 S.W.3d
869, 872 (Tex. App.CDallas 2003, no pet.).  The Court held that
by placing garbage out on the curb for the express purpose of conveying it to a
third party, the trash collector, appellant failed to manifest a subjective
expectation of privacy society would be prepared to accept as objectively
reasonable.  See Greenwood, 486 U.S. at 40-41, 108 S.Ct. at 1629.  The
Court noted the trash collector himself could have sorted through the garbage,
as well as animals, children, scavengers, and snoops.  Id. at 40, 108
S.Ct. at 1628  In light of the public=s access to another=s trash, the Court concluded society
would not accept as reasonable an expectation of privacy in one=s trash left out on a curb.  Id.
at 41, 108 S.Ct. at 1629.      








In the
case at hand, appellant left his garbage out on the curb, similar to the
appellant in Greenwood.  Appellant did not go to any lengths to protect
the privacy of his trash that would distinguish this situation from the one in Greenwood. 
Appellant has not alleged that he falls within any exception to the well
settled law of Greenwood.  Texas appellate courts have followed Greenwood
and we will do the same.  See Nilson v. State, 106 S.W.3d 869,
874-75 (Tex. App.CDallas 2003, no pet.); Serrano v. State,
123 S.W.3d 53, 62 (Tex. App.CAustin 2003, pet. ref=d).  Accordingly, appellant=s first issue is overruled.     

2.         The trial court did not
err in denying appellant=s motion to suppress evidence seized
from appellant=s postal box.

In his
second issue, appellant argues the trial court erred in denying his motion to
suppress evidence seized pursuant to a warrantless search of his rented private
postal box.  Appellant contends he has an expectation of privacy in the postal
box and therefore, his rights under the Fourth Amendment were violated.

Both
parties concede there is no expectation of privacy in the exterior of an
envelope while it is in the stream of commerce.  However, the parties dispute
whether an expectation of privacy attaches to the envelope, including its
exterior, when the envelope is placed in a private postal box.  The State
argues the expectation of privacy only extends to the contents of the envelope,
regardless whether the envelope has been placed in a private postal box. 
Appellant compares the private postal box with a residence.  He argues there is
a legitimate expectation of privacy in the exterior of the letters placed in
his postal box.  Neither side cited a case directly on point.  








The
Fifth Circuit encountered a similar set of facts in United States v.
Osunegbu, 822 F.2d 472 (5th Cir. 1987).  In that case, Osunegbu=s husband rented a private postal box
under a fictitious name.  Id. at 474.  Some local residents began
complaining their mail was being forwarded to a private postal box.  Id. 
The postal inspector went to the postal facility where the mail was being
sent.  Id.  He asked the manager of the facility to show him the mail
inside the postal box rented to Osunegbu.  Id.  The inspector did not
have a search warrant.  Id.  The manager complied and allowed the
inspector to look at the addresses on the letters and parcels.  Id.  The
inspector did not open the mail, he only verified that the names on the letters
matched the names of the complainants.  Id.  The inspector then set up
surveillance at the postal facility and determined Osunegbu and her husband
were the renters of the postal box.  Id.  Osunegbu argued the
warrantless search of the postal box violated her expectation of privacy.  Id.
at 477.                

The
Fifth Circuit held the warrantless search of the mailbox was not violative of
the Fourth Amendment rights of Osunegbu.  Id. at 480.  The court held
the manager of the postal facility had authority as an agent to consent to the
search of the mailboxes.  In arriving at its decision, the court focused on the
lay out of the postal facility.  See id.  The postal facility in Osunegbu
is similar to the one involved in the current case.  The front of the postal
boxes could only be opened by a key, while the back remained open for workers
at the postal facility to sort the mail and place it in the mailboxes.  Id. 
The court emphasized that the manager had Acomplete and unfettered access@ to the mailbox contents.  Id.
at 479.  Additionally, the court noted the manager would have to reenter
the mailbox from time to time to rearrange mail if bigger items needed to be
placed in the mail box, or if mail was accidently placed in the wrong box.  Id.
at 479-80.  The Fifth Circuit concluded because of the manager=s unfettered access to the mailboxes
he could effectively consent, as an agent, to an examination of the letters and
parcels in the mailbox.  Id. at 480. 

We
believe the Fifth Circuit=s reasoning is persuasive and adopt its interpretation.  The
facts established regarding the search of the postal boxes in this case are
substantially similar to the facts in Osunegbu.  Appellant=s postal box could only be opened in
the front by a key, however the back remained open to The UPS Store employees. 
The manager of The UPS Store consented to the postal inspector=s request to view appellant=s mail by collecting the mail from
appellant=s postal box and copying the front of the envelopes for the inspector. 
We agree with the Fifth Circuit that the lay out of The UPS Store is a critical
factor in finding the manager of the store had authority to consent to the
search.    








In
addition to the lay out of The UPS Store, we believe the Form 1583, AApplication for Delivery of Mail
Through Agent@ is evidence of the mailing center=s authority to consent to a search of
a rented postal box at its facility.  Anyone renting a postal box at a
commercial mailing center is required to fill out Form 1583 by the United
States Postal Service.[4]  In this
case, the State entered into evidence Form 1583s signed by appellant and his
wife.  Specifically, the State provided a copy of the Form 1583 signed for both
of the searched postal boxes.  A copy of the completed form 1583 is filed with
the United States Postal Service and another copy is retained by the commercial
mail receiving agency, The UPS Store in this case.  The form requires
information such as the applicant=s name, address, telephone number,
and two forms of identification.  Form 1583 designates the commercial mail
receiving center as the customer=s authorized agent for the receipt of
mail.  We conclude this agency relationship gives the mailing center the
authority to consent to a search of its customers= postal boxes.   The United States
Supreme Court and our own Court of Criminal Appeals has held that a person with
common authority over property may consent to a search of the property.  See 
United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d
242 (1974); Patrick v. State, 906 S.W.2d 481, 490 (Tex. Crim.
App. 1995).

 We hold
the agency relationship created by Form 1583 and the layout of The UPS Store
are sufficient to grant the manager of the store authority to consent to a
search of appellant=s postal box.  Accordingly, we overrule appellant=s second issue.  

3.         The trial court did not
err in denying appellant=s motion to suppress evidence seized
pursuant to a valid search warrant. 

In his
third issue, appellant argues the trial court erred in overruling his motion to
suppress evidence obtained pursuant to a search warrant.  Appellant complains
the evidence in the affidavit supporting the search warrant is insufficient to
create probable cause for the issuance of the warrant.








In
Texas, the affidavit supporting a search warrant must state probable cause.  State
v. Walker, 140 S.W.3d 761, 765 (Tex. App.CHouston [14th Dist.] 2004, no pet.).  To determine whether the facts
alleged in an affidavit sufficiently support a search warrant, a magistrate or
a court examines the totality of the circumstances.  Ramos v. State, 934
S.W.2d 358, 362-63 (Tex. Crim. App. 1996).  The allegations in an affidavit are sufficient if
they would Ajustify a conclusion that the object of the search is probably on the
premises.@  Id.  In determining the sufficiency of a search warrant affidavit,
a reviewing court may consider only the facts found within the four corners of
the affidavit.  Hankins v. State, 132 S.W.3d 380, 388 (Tex. Crim.
App. 2004).  Nevertheless, the
reviewing court should interpret the affidavit in a common sense and realistic
manner, recognizing that the magistrate was permitted to draw reasonable
inferences from the facts and circumstances alleged.  Id.  

Our
scrutiny of the sufficiency of an affidavit, like the trial court=s scrutiny, does not take the form of
a de novo review; instead we determine whether the magistrate had a
substantial basis for concluding that a search would uncover evidence of
wrongdoing.  Illinois v. Gates, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331,
76 L.Ed.2d 527 (1983); Walker, 140 S.W.3d at 765.  In conducting this review,
we give great deference to the magistrate=s determination of probable cause.  Ramos,
934 S.W.2d at 363. 








Appellant
does not dispute the accuracy of the statements contained in the affidavit, he
merely argues the facts alleged are not sufficient to create probable cause. 
Specifically, appellant claims photographs taken at the Chase ATM machines were
of such poor quality to be insufficient to put appellant in possession of the
suspect credit cards.  He also claims the evidence seized pursuant to the
postal box search and garbage search is inadmissible because the seizure of
such evidence was done in violation of his Fourth Amendment rights.  As
discussed above, neither the search of appellant=s garbage, nor the search of his
postal box was violative of the Fourth Amendment, and therefore, the fruits of
such searches are admissible.  Under the totality of the circumstances and in
light of the fact the evidence seized from the garbage and postal boxes is
admissible, we do not believe the magistrate=s determination of probable cause was
unreasonable.  See Ramos, 934 S.W.2d at 363.   

As to
appellant=s contention the ATM machine photos are insufficient, we believe there is
enough evidence in addition to the ATM machine photos to find probable cause
regardless.  Detective David Schultz prepared the affidavit used to obtain the
search warrant.  Detective Schultz had personal knowledge of the facts stated
in the affidavit from his ongoing investigation in this case.  The affidavit
illustrated the case from the beginning, explaining how Russell Locke compiled
his expansive report showing the links between the fraudulent accounts.  The
affidavit contained copies of the applications for the postal boxes signed by
appellant and his wife.  It described how the Fort Bend County Sheriff=s Office eventually identified
appellant through his numerous driver=s licenses under different aliases. 
Detective Schultz explained in the affidavit how he found the address of appellant=s residence by running a search in
the Fort Bend County property records on one of appellant=s aliases.  Detective Schultz also
detailed how the Fort Bend County Sheriff=s Office set up a trash pick up at
appellant=s house and found shredded credit cards and mail relating to the
fraudulent accounts in appellant=s garbage.  The affidavit included a
list of the names found on the mail in appellant=s mailbox, which matched up with the
names on the fraudulent accounts.  The affidavit is over thirty pages long and
provides in great detail various different sources of evidence pointing to
appellant=s residence and vehicle as being places where further evidence of the
elaborate fraud scheme could be found.  Thus, it is entirely reasonable to conclude
the magistrate had a substantial basis for finding the search warrant would
uncover further evidence of theft.  See Walker, 140 S.W.3d at 765. 
Consequently, appellant=s third issue is overruled.  

II.  Is
the Evidence Sufficient to Support a Finding of Venue in Fort Bend County? 








In his
fourth issue, appellant challenges the sufficiency of the evidence supporting
venue in Fort Bend County.  Specifically, appellant argues the trial court
erred in overruling his motion for an instructed verdict on the issue of venue
and further contends the jury verdict is not supported by a preponderance of
the evidence on the issue of venue.  

A.        Standard of Review

The law
is well settled that a challenge on appeal to the denial of a motion for
directed  verdict is a challenge to the legal sufficiency of the evidence.  Turner
v. State, 101 S.W.3d 750, 761 (Tex. App.CHouston [1st Dist.] 2003, pet. ref=d).  When reviewing legal
sufficiency, we view all the evidence in the light most favorable to the
verdict and then determine whether a rational trier of fact could have found
venue was proper by a preponderance of the evidence.  See Hooper v. State,
214 S.W.3d 9, 13 (Tex. Crim. App. 2007); Tex. Code Crim. Proc. Ann. art. 13.17 (Vernon
2005).  The jury, as the trier of fact, is the sole judge of the credibility of
witnesses.  See Moreno v. State, 755 S.W.2d 866, 867 (Tex. Crim. App.
1988).  The jury chooses whether or not to believe all or part of a witness=s testimony.  See id.  We do
not engage in a second evaluation of the weight and credibility of the
evidence.  Muniz v. State, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993); Harris
v. State, 164 S.W.3d 775, 784 (Tex. App.CHouston [14th Dist.] 2005, pet. ref=d).  Thus, if there is evidence
establishing venue by a preponderance, we are not authorized to reverse the
judgment on sufficiency of the evidence grounds.  See Black v. State,
645 S.W.2d 789, 791 (Tex. Crim. App. 1983).

B. Analysis








The
general venue provision of Article 13.18 of the Texas Code of Criminal
Procedure provides that Aif venue is not specifically stated, the proper county for
the prosecution of offenses is that in which the offense was committed.@  Tex. Code Crim. Proc. Ann. art.
13.18 (Vernon 2005).  When several thefts are aggregated into a single offense
under Section 31.09 of the Texas Penal Code, the proper county for prosecution
under the Aplain@ language of Article 13.18 is any county in which the individual thefts
or any element thereof occurred.  State v. Weaver, 982 S.W.2d 892, 893
(Tex. Crim. App. 1998).[5]  Applying the
Aplain@ language of Article 13.18 to this
case, Fort Bend County is a proper venue for prosecution of all the thefts
aggregated into the single offense alleged in the indictment.  See  id. 
There is no need for the State to prove the entire $200,000.00 or more was
stolen in Fort Bend County, it is sufficient for the State to show only some of
the aggregated thefts occurred in Fort Bend County.

The
report compiled by Russell Locke included a list of transactions where the
fraudulent credit cards were used.  The report showed numerous ATM transactions
on the fraudulent accounts in Fort Bend County. Additionally, there are photos
of an individual looking similar to appellant in a vehicle registered to
appellant=s name at ATM machines in Fort Bend County.  Thus, there is evidence
appellant committed theft in Fort Bend County when he used the fraudulent
credit cards to obtain cash advances from an ATM machine in Fort Bend County. 
Because appellant=s thefts were committed pursuant to one scheme and continuing
course of conduct, evidence of any theft or element thereof in Fort Bend County
is sufficient to sustain venue in Fort Bend County.  See id.  A rational
trier of fact could find venue in Fort Bend County by a preponderance of the
evidence and therefore, the evidence is legally sufficient to support the jury
verdict and the trial court=s denial of appellant=s motion for a directed verdict.  See
Hooper, 214 S.W.3d at 13.  Accordingly, appellant=s fourth issue is overruled.      

 

 

 








Conclusion

Having
overruled all four of appellant=s issues, we affirm the judgment of the trial court.

 

 

 

 

/s/        John S. Anderson

Justice

 

 

 

 

Panel consists of Chief Justice
Hedges and Justices Anderson and Seymore.

Publish C Tex.
R. App. P. 47.2(b).  

 

 

 

 

 

 

 

 

 

 









[1]  This is not a case of identity theft, although some
of the names and social security numbers used to obtain the accounts may be
those of real persons, appellant did not specifically target real persons.   





[2]   Locke did not specifically testify why he decided
to alert Fort Bend County, as the accounts were linked to addresses in many
counties across Texas.  However, there were a substantial number of accounts
tied to the Fort Bend County area.  





[3]  Detective Schultz also ran a driver=s license search on the names and obtained a copy of
appellant=s driver=s
license.  However, appellant listed The UPS Store address as his address on his
driver=s license.    





[4]  USPS Domestic Mail Manual (ADMM@) ' 153.212 (incorporated by reference, 39 C.F.R. ' 111.1 (2009).





[5]   Appellant acknowledges Weaver is the
controlling law, but contends the decision is Aclearly wrong@ and asks us to reject its reasoning.  As an
intermediate court of appeals, we are bound by controlling authority from the
Court of Criminal Appeals and therefore cannot reconsider its holding as
appellant requests.  Zarychta v. State, 44 S.W.3d 155, 162 (Tex. App.CHouston [14th Dist.] 2001, pet. ref=d).