

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-19-00386-CR

———————————————————

SUSAN MEGWA, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 362nd District Court
Denton County, Texas
Trial Court No. F-2014-2361-D

Before Sudderth, C.J.; Womack and Wallach, JJ.
Opinion by Chief Justice Sudderth

# OPINION

## I. Introduction

Evidence that Appellant Susan Megwa was running a "pill mill," i.e., a pharmacy that fills fraudulent prescriptions, led a jury to convict her of one count of delivery of a controlled substance (hydrocodone, 28 grams or more but less than 200 grams), a second-degree felony, *see* Tex. Health & Safety Code Ann. § 481.114(a), (c), and one count of diversion of a controlled substance (alprazolam), a third-degree felony. *See id.* § 481.1285(b)(2), (c). The jury assessed Megwa's punishment at 15 years' and 10 years' confinement, respectively, and a $10,000 fine for each offense, and the trial court entered judgment and set her sentences to run concurrently. *See* Tex. Penal Code Ann. § 12.33 (stating that second-degree felony punishment is 2 to 20 years' confinement and up to a $10,000 fine), § 12.34 (stating that third-degree felony punishment is 2 to 10 years' confinement and up to a $10,000 fine).

In a single issue, Megwa complains that the trial court erred by refusing to suppress the evidence obtained pursuant to a June 2014 search warrant, complaining (1) that the failure to disclose material evidence about the credibility of Deneena Broadnax, an informant, invalidated the warrant and (2) that a municipal court judge signed the warrant after a district court judge had signed a similar warrant in May 2014, rendering the June 2014 search warrant invalid pursuant to Texas Code of Criminal Procedure Article 18.01(d), which sets out the requirements for obtaining a

2

search warrant of a previously searched person, place, or thing. *See* Tex. Code Crim. Proc. Ann. art. 18.01(d).

But the record reflects that Broadnax was not a confidential informant; instead, she was an identified controlled-buy witness, and her credibility was not an issue in determining probable cause to support the warrant's issuance when the affidavit contained independent facts that corroborated her information. Further, the June 2014 search warrant was for a separate offense supported by separate probable cause, and construing Article 18.01(d) in the manner advocated by Megwa would lead to absurdities the Legislature cannot have intended. Accordingly, we overrule Megwa's sole issue and affirm the trial court's judgment.

## II. Background

Megwa owned Meg's Discount Pharmacy in Denton. On May 19, 2014, Denton Police Investigator Rachel Fleming procured search warrants for the pharmacy and for Megwa's home, bank accounts, and vehicles from a district court judge. In the affidavits supporting those warrants, Investigator Fleming averred that there was probable cause to believe that Megwa had engaged in "diversion of controlled substances for unlawful use" by "virtue of [her] profession or employment" under Health and Safety Code Section 481.1285 and that Megwa and her husband had engaged in money laundering under Penal Code Section 34.02. *See* Tex. Health & Safety Code Ann. § 481.1285(b)(2); Tex. Penal Code Ann. § 34.02. Investigator Fleming received permission to search for and seize a variety of items.

3

As a result of the May 2014 searches, police seized hard copies of prescriptions, a surveillance system hard drive,[1] drugs, U.S. and Nigerian currency, a cell phone, computer equipment, a safe, some vehicles, cashier's checks in amounts varying from $1,600 to $119,668.74, and various documents.

Not quite a month later, on June 16, 2014, Investigator Fleming sought another search warrant for the pharmacy. As she had in the May 2014 affidavits, Investigator Fleming cited her experience in investigating financial crime cases.[2] She identified Megwa as a registered pharmacist and, as she had in May 2014, averred that Megwa had "knowingly diverted to the unlawful use or benefit of another person a controlled substance to which [she had] access by virtue of [her] profession or employment"

---

[1]On November 4, 2014, Investigator Fleming sought a warrant to search the pharmacy's surveillance system. The same municipal court judge who signed the June 2014 warrant signed the November 2014 warrant granting that search, but Megwa does not complain about this on appeal.

[2]In both the May and June affidavits, Investigator Fleming stated that she had been employed as a licensed peace officer since April 1998, that she had been an investigator in the City of Denton Police Department's Financial Crimes Unit from January 2005 to April 2011, and that at the time of the affidavits, she had been assigned to the Narcotics Unit as a "Diversion Investigator/Asset Forfeiture Specialist." She stated that she had been involved "in hundreds of cases related to fraud, money laundering, identity theft, forgery, credit card abuse, narcotics trafficking, prescription fraud[,] and diversion" and had investigated money laundering cases related to narcotics trafficking and other criminal enterprises. She further stated that she had "authored search and seizure affidavits in criminal cases involving illegal financial activities and ha[d] attended law enforcement training courses concerning the investigation of financial crimes and organized criminal activities."

4

under Health and Safety Code Section 481.1285. *See* Tex. Health & Safety Code Ann. § 481.1285(b)(2).

Investigator Fleming recited some of the facts that were included in her May 2014 affidavits[3] and referenced the May search and arrest warrants before adding new facts regarding a controlled buy she had arranged with Deneena Broadnax:

> At about 0940 hrs on June 16, 2014[,] Deneena Broadnax entered Meg's Discount Pharmacy and asked Pharmacist Susan Megwa what she had. Susan sold Broadnax quantity 120 hydrocodone-APAP 10-325 mg for $360 cash with $120 owed. Broadnax did not have a prescription for the hydrocodone-APAP 10-325 mg. Susan placed the hydrocodone-APAP into a prescription bottle previously labeled as Broadnax's hydrocodone. According to Broadnax, Susan removed the hydrocodone APAP-pills from a prescription bottle previously labeled for Louis Bell which had not been picked up. As Broadnax was leaving, Your Affiant watched as she was waved back inside. Broadnax advised[,] Megwa then removed the top portion of a prescription label on a bottle of quantity 60 alprazolam 2 mg for Louis Bell and gave it to Broadnax[,] advising Broadnax owed Megwa an additional $240 later in the afternoon. Broadnax stated Megwa had Broadnax sign the controlled substances pick-up log with her left hand in the initials "LB" for the delivery of the alprazolam.

---

[3]In both the May and June affidavits, Investigator Fleming stated that she had "made several prescription fraud arrests in which the defendants were utilizing Meg's Discount Pharmacy because of the ease in getting the fraudulent or questionable prescriptions filled."

Investigator Fleming did not include in her June affidavit the following facts that she had included in her May affidavit: information that she had received from the Texas State Board of Pharmacy about Megwa's prescription ratio and prices; Megwa's audio-recorded admission in 2013 that she had been providing Adderall, a controlled substance, to a customer without a prescription; her research into Megwa's prescribing history obtained by accessing the Texas Department of Public Safety Prescription-Access-in-Texas database records; and information she had acquired through trash searches at the pharmacy and at Megwa's home.

5

The affidavit contained no explanation of who Broadnax was or how she became involved, but it did recite that alprazolam 2 mg and hydrocodone-APAP 10-325 mg were listed on DEA controlled-substance schedules and that Investigator Fleming had located May 5, 2014 prescriptions for Louis Bell for alprazolam 2 mg and for hydrocodone-APAP 10-325 mg on Megwa's dispensing report, which was seized in the May pharmacy search. Investigator Fleming also listed three serial numbers from the currency she had provided to Broadnax to make the buy and stated that she had searched Broadnax prior to the transaction and had "monitored the transaction assuring that Broadnax did not obtain the hydrocodone-APAP 10-325 mg or alprazolam [2 mg] from any other sources." In the affidavit, Investigator Fleming asked for permission to search for and seize, among other things, prescription bottles or labels bearing the name Louis Bell.

Investigator Fleming presented the affidavit to a magistrate judge,[4] who signed the warrant for evidence of unlawful diversion "or other violations of the penal laws of this state" that might be found in the pharmacy. Prescription bottles, currency,

_____

[4]The magistrate judge had served as a judge "in some capacities" since 1985 and had reviewed "easily thousands" of affidavits for search warrants. *See* Tex. Code Crim. Proc. Ann. art. 18.02(a) (setting forth grounds for issuance of search warrants). We use "municipal court judge" and "magistrate judge" here interchangeably because the judge signed the warrant as the presiding judge of the Denton Municipal Court of Record No. 1 "as magistrate for Denton County." *See generally* Tex. Code Crim. Proc. Ann. art. 2.09 (defining "magistrate" to include "judges of the municipal courts of incorporated cities or towns").

6

prescription bottle labels, and other items and documents were seized during the search.

Megwa moved to suppress the items seized in the June search,[5] complaining that Investigator Fleming had omitted key facts pertaining to Broadnax's identity, credibility, and criminal history and that the magistrate judge had lacked the statutory authorization to issue the warrant because it was a subsequent search warrant. *See* Tex. Code Crim. Proc. Ann. art. 18.01(d). After several hearings, the trial court denied the motion, stating, as to the second argument, "[I]f you've got a new crime, you can do a warrant and it's not considered a subsequent warrant."

### III. Suppression

In her single issue, Megwa makes the same arguments that she raised in the trial court. The State responds that Megwa has not met her burden under *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674 (1978), to show by a preponderance of the evidence that Investigator Fleming intentionally or knowingly, with reckless disregard for the truth, made any misstatements or omissions in the June affidavit that would affect the probable cause finding supporting the warrant's issuance, and that the June search warrant involved a new, separate offense from the earlier warrant and was supported by separate probable cause, so it was not a "subsequent" warrant under Article 18.01(d).

---

[5]Megwa also sought to suppress the evidence obtained during the May searches but has abandoned those complaints in this appeal.

The trial court held three suppression hearings, the first two of which were evidentiary.[6] At these hearings, the trial court heard the following evidence and arguments set out below.

## A. Hearing Testimony

### 1. May 20, 2014 Encounter

At the time of the first hearing, the June 16, 2014 incident report narrative by Investigator Fleming, who had been a licensed peace officer for almost 21 years and had been with the Denton Police Department since 1998,[7] was admitted into evidence and provided a detailed recitation of the history of Investigator Fleming's connection with Broadnax.

After the May 2014 search warrant was issued, Megwa's pharmacy was under surveillance. Investigator Fleming met Broadnax on May 20, 2014, during a traffic stop after Broadnax had left the pharmacy. During the traffic stop, Broadnax was found in possession of alprazolam in an unlabeled prescription bottle, and the labels on her other prescription bottles did not match the contents. The traffic stop was followed by a phone conversation between Investigator Fleming and Broadnax on

---

[6]The hearings were held November 9, 2018; May 17, 2019; and September 27, 2019.

[7]Over the course of her career, Investigator Fleming had been "a patrol officer, a community resource officer, a financial crimes detective, a narcotics detective, a patrol sergeant, a special events sergeant, and a detective-sergeant over family services."

June 13, 2014, in which Broadnax complained about the confiscation of her "psych meds" and subsequent five hours of incarceration. Broadnax also told Investigator Fleming that MHMR was treating her for schizophrenia, depression, and anxiety; that she had started using crack cocaine at age nine; that she was chemically imbalanced; and that she "ended up in the nut house for 21 days" after her hysterectomy.[8]

### 2. June 16, 2014 Undercover Buy

Sergeant Bobby Ray, who was the supervisor over special operations at the time,[9] informed Investigator Fleming that Broadnax was amenable to making a buy at Megwa's pharmacy, and he approved Investigator Fleming's overall plan to have Broadnax make the buy in exchange for dropping the misdemeanor Xanax[10] charge against her from the traffic stop.

On June 16, 2014, Broadnax arrived at the police station between 8:30 a.m. and 9:00 a.m. Investigator Fleming instructed her to buy controlled substances, specifically hydrocodone, from Meg's Pharmacy. Investigator Fleming searched Broadnax's purse, person, and car to ensure that Broadnax had no controlled

---

[8]At the hearing Investigator Fleming testified that she did not recall this information but did not dispute it, stating, "If it's in the report, that's what was said."

[9]Sergeant Ray retired in April 2019 after 35 years of service, 33 of which had been with the Denton Police Department.

[10]Alprazolam is the active ingredient in Xanax. *Pruitt v. State*, No. 02-18-00453-CR, 2020 WL 5242422, at *1 (Tex. App.—Fort Worth Sept. 3, 2020, pet. ref'd) (mem. op., not designated for publication).

substances on her already and put a button camera on her purse. Broadnax carried with her an empty prescription bottle in her name.

Investigator Fleming said that she did not think Broadnax had any of her own money when she went into the pharmacy. Instead, the police provided funds from the "imprest fund account" after Investigator Fleming recorded the bills on a photocopier so that she could track the serial numbers after the undercover buy.

Investigator Fleming followed Broadnax to the pharmacy and parked in the parking lot across the street. There were already several other surveillance units positioned around the pharmacy, and some of the officers and sergeants "were parked directly across the street where they could see into the store" through the glass windows. Investigator Fleming watched Broadnax enter the pharmacy and then leave the pharmacy and return to her vehicle before "a hand waved her back" into the pharmacy. After Broadnax returned inside the pharmacy and came back out again, she entered her vehicle and left the parking lot. When Investigator Fleming called Broadnax to remind her that they were to meet in a nearby Kroger parking lot, Broadnax told her, "I got a double whammy."

Investigator Fleming initially testified that Broadnax was inside the pharmacy for a total of 10 to 15 minutes.[11] Investigator Fleming said that she did not see

_____

[11]Later, a half a year after the first portion of the suppression hearing, Investigator Fleming stated on cross examination that "[b]etween the two trips in, her original trip in and being waved back in, I believe it was somewhere between 30 and 40 minutes total."

anyone else go into the store. She also testified that she maintained visual surveillance of Broadnax's vehicle until she saw Sergeant Ray follow immediately behind it. Sergeant Ray then followed Broadnax's vehicle to the Kroger parking lot and stayed with Broadnax until Investigator Fleming arrived.

When Investigator Fleming arrived at the Kroger parking lot, Broadnax's formerly empty prescription bottle was full of hydrocodone pills, and Broadnax had also acquired a prescription bottle missing the upper half of the label (prescription number and patient name) that was filled with alprazolam. Broadnax told her that Megwa had filled her empty pill bottle with hydrocodone pills that Megwa had removed from another bottle that was already in a fill bag waiting to be dispensed and that Megwa had told Broadnax that she was going to owe her more money for the pills.

Broadnax also told Investigator Fleming that after she was waved back into the pharmacy, Megwa had torn off the top half of a pill bottle label and had directed Broadnax to sign the dispensing log to indicate that the medication in the bottle had been received by the real patient. Specifically, Megwa instructed Broadnax to use her left hand to make the real patient's initials so that it appeared that the patient had picked it up. According to Broadnax, Megwa also told her that she owed more money for the alprazolam and to bring the money that afternoon when she brought the additional funds for the hydrocodone. Receiving the second, unanticipated medication was the "double whammy" to which Broadnax had referred.

11

Investigator Fleming stated that this information was consistent with what she had observed and that she had found the information reliable and trustworthy based on how specific Broadnax had been about the name of the patient whose initials she had signed. Based on that specificity, Investigator Fleming was able to locate the patient's name and medications in the dispensing log.

Investigator Fleming said she had no concerns that Broadnax had lied or had obtained the pills from someone else or that anything else had happened inside the pharmacy other than what Broadnax had told her. Nor did Investigator Fleming have any concerns about Broadnax's mental health ability to make the buy.[12] Investigator Fleming testified that she had presumed that Broadnax had a criminal history, although she had not been aware of the specifics, because most informants have some sort of criminal history. But she did not run Broadnax's criminal history to confirm her presumption.

### 3. Search Warrant Affidavit

Sergeant Ray, who had authored hundreds of search warrant affidavits during his 35 years as a police officer, asked Investigator Fleming to author the search warrant affidavit for the pharmacy even though he and other narcotics officers had

---

[12]Investigator Fleming said that she had taken Broadnax at her word when she self-disclosed being an MHMR patient and did not ask her about any medications she was on for her mental health conditions.

more experience.[13]  She did not normally do controlled-buy affidavits; this one had been her first.  Investigator Fleming began putting together the affidavit as soon as she returned to the police station using facts Broadnax had recounted about what had happened inside the pharmacy during the undercover buy.  Investigator Fleming explained that she did not list all of the serial numbers on the bills given to Broadnax in the affidavit because "[o]ther narcotics detectives who usually do controlled[-]buy warrants advised that [she] didn't need to list all of them."

Information about the button camera, which was supposed to record the pharmacy transaction, was also not included in the search warrant affidavit because the video had malfunctioned.[14]  Furthermore, Investigator Fleming said that she had been told by narcotics officers that a video is only required in confidential informant operations, and Broadnax was named in the affidavit.

---

[13]While Investigator Fleming had worked on hundreds of cases, only a few had involved diversion of a controlled substance.  Megwa's case had been her second diversion-of-a-controlled-substance case involving a pharmacist.

[14]The trial court reviewed the video recorded by the button camera.  The video shows the dashboard of Broadnax's vehicle as she drives to the pharmacy and her exit from the vehicle with the camera on her purse.  She enters the pharmacy, which has glass windows in front, and parks her purse on a chair near the pharmacist's window.  Her conversation at the pharmacist's window is almost completely inaudible, and the video shows only the hem of Broadnax's dress, her calves, and her flip flops as she stands at the pharmacist's window.  At approximately 8.5 minutes, Broadnax walks back over to her purse but then continues to leave it on the chair while she waits at the window.  At approximately 15.5 minutes, Broadnax walks back over to her purse, retrieves something, and returns to the pharmacist's window.  The video ends at 16 minutes and 40 seconds.

Investigator Fleming acknowledged that the June search warrant affidavit did not mention how Broadnax, who had been acting not as a confidential informant but rather in an "undercover capacity as an agent of the police," had become involved in the investigation. She also agreed that the affidavit did not contain any statements to establish Broadnax's credibility or reliability and that there was "backstory"[15] she had not included about Broadnax and her connection to the pharmacy.

Investigator Fleming acknowledged that none of Broadnax's mental health and medication information was in the June affidavit and agreed that she had not told the magistrate judge about any of it. She stated that it had not occurred to her to put that information in the search warrant affidavit because she did not consider the omissions to be material "to what happened that day." Investigator Fleming also stated that while depression, anxiety, schizophrenia, and drug use may be relevant to a person's credibility, "in law enforcement, those are the people that are often utilized in operations like this." She stated, "I have never written a search warrant where I have listed mental illnesses and addictions and things such as that." Investigator Fleming said that she did not think that Broadnax's having self-disclosed as a psychiatric patient would either assist or deter the magistrate judge in finding probable cause

---

[15]Some of the background information about how Broadnax became involved was recounted in the November 2014 search warrant affidavit for the pharmacy's surveillance system because Investigator Fleming wanted to search the system to see if the May 2014 transaction between Broadnax and Megwa had been captured.

because "people who have mental health issues are perfectly capable of telling the truth."

Regarding probable cause, Investigator Fleming admitted that probable cause hinged on Broadnax's credibility, testifying as follows:

> Q. You watched the video before you swore out the affidavit for the search warrant, didn't you?
>
> A. Correct.
>
> Q. And the video does not show anything that substantiates paragraph five, the big thick paragraph on page 2 of the affidavit, does it? You can't see anything.
>
> A. That is correct.
>
> Q. So you have to take her word for it. Right?
>
> A. I know she didn't have the pills before she went in, and she had the pills when she came out.
>
> Q. I understand that, but that's -- it's not that simple, is it, Detective? Because the whole crux of this is that Susan Megwa had to deliver to her. That's the whole crime you're trying to investigate. That Broadnax didn't have it on before -- didn't have it on her person. She goes to the pharmacy. There's a delivery, an illegal delivery, so she says. She comes back out with the pills. You've got your PC if she's to be believed.
>
> A. Correct.

Investigator Fleming denied that she had intentionally or recklessly misled the magistrate judge by placing incorrect facts into the affidavit or by purposefully omitting any information about Broadnax's mental health or potential criminal history to get him to sign the warrant.

15

Sergeant Ray testified that he spoke with Investigator Fleming about the search warrant affidavit she had drafted after Broadnax made the controlled buy and that he did not tell her to omit information about Broadnax's psychological and mental health history. He stated that he generally did not include an informant's criminal history in a search warrant affidavit because most of the time it was not relevant and that he did not think Broadnax's criminal history was relevant to the probable cause determination in this case when there was other corroborating evidence. He explained that if everything in an investigation was included in the affidavit, "the affidavit would end up "be[ing] . . . 19 pages . . . [s]o you put in the relevant information that establishes probable cause." He also explained that there may be relevant case information that is not necessarily relevant to establishing probable cause and making the decision of what to include is up to the affiant. He reviewed and approved Investigator Fleming's affidavit but did not instruct her on what to include or exclude.

### 4. Execution

The magistrate judge who had issued the June 2014 warrant explained that, in comparison to other informants, a confidential informant provides information when not being observed by a police officer, when "you're going solely on the word, and so you need to establish some degree of credibility." By way of comparison, he noted, "In the instance in which the person is identified and they're being monitored or watched, observed by the police officer and they can corroborate it and later

16

corroborate the information once they have contact with them again, I don't think it's near as important." He agreed that credibility is always a factor and that, to an extent, the cooperating individual's motivation could affect her credibility, but he said that in this circumstance, the corroboration "gave [him] a certain level of assurance." He pointed out that the instant situation was a controlled buy: "They watched them go in. They searched them before they went in. They searched them when they came out." That, plus corroborating facts regarding the May 5, 2014 prescription for Louis Bell for alprazolam, provided credibility and "eliminate[d] some of the need that [he] had to know . . . the background of the individual informant."

The magistrate judge stated that he wanted to know information about a cooperating witness's criminal history and motivation when it related to the issues inside the affidavit but said that he would not have time to look at a witness's entire criminal history. He also indicated that the mental health of an informant or anyone else acting as an agent of the police was not a concern in every situation involving a search warrant affidavit: "I suppose it depends on what their mental illness is" because "80 percent of the people I speak to on a daily basis have some degree of mental health issue" and "just because they receive mental health treatment through MHMR does not mean they're not credible." In this case, he was not uncomfortable that Investigator Fleming had failed to provide mental health information about Broadnax, explaining that corroboration of the informant's name made him feel confident that the warrant issued on correct information:

17

You know, the only thing that seemed a little bit odd about it, that in retrospect I wish I might have paid a little bit more attention, is this name just appears, Broadnax or whatever. But, no, I don't think -- did I feel -- do I feel now after reading that report that I was misled? And the answer is no.

## 5. Arguments

Megwa's counsel argued that the omission of the facts that Broadnax had mental problems, that she was "working off a case," and that the police had unsuccessfully tried to record the transaction were material and intentional omissions to mislead the magistrate judge and that Investigator Fleming's failure to ask Broadnax whether she was on any medication made no sense when "[t]his whole case is about meds" and the police had arrested her "for having a ton of medication in her purse."

The prosecutor then argued that there was no evidence that Investigator Fleming had hidden Broadnax's mental health information or criminal history from the magistrate judge to mislead him. Megwa's counsel retorted, "[D]o we actually really think that she's going to stand here and say, 'Yeah, I intentionally didn't put that in there'? You're never going to get that Perry Mason moment in any courtroom these days."

At the final pretrial hearing, defense counsel complained, among other things, that the June search warrant was a subsequent search warrant under Article 18.01(d):

> THE COURT: So your argument is because it was previously searched, even though there's new evidence of a new crime there, that

18

this is a subsequent search warrant simply because it was previously searched.

[Defense counsel]: Yeah, exactly. I mean, I'm reading it verbatim. I knew you were going to ask that question, and I asked [co-counsel] to research it. There's no case law that we can find that says a subsequent search warrant may be issued under that section of the article, 18.02, to search the same person, place, or thing, which is the same pharmacy, the same pharmacist. Must be signed, if it's under 18.02(10), again, by a district judge. And obviously [the magistrate judge] is not a district judge, a Court of Criminal Appeals judge, or a -- on the Supreme Court or a court of appeals.

So we -- well, we -- the statute says it. I don't see there to be any distinction. I tried to find case law that says that it doesn't -- there's an exception if there's a new alleged offense. It's in the code. It doesn't look like -- it looks like they just went to [the magistrate judge] and got this because he was convenient.

I think it was -- but in any event, if I'm wrong and if there's -- I don't know how to interpret it other than the way -- the plain language of the statute. If the [L]egislature wanted a municipal court judge to be able to do a subsequent search warrant, they would allow that, and they didn't. And, in fact, they specifically excluded it.

And that's just the person they choose. That's their luck. Unfortunately, they didn't go back -- I would have gone back to [the district judge] if I were her, but they didn't. And that, I believe, just invalidates the entire search warrant. He did not have authority to sign it in the first place.

The State responded with a citation to *Albright v. State* (*Albright I*), No. 05-92-00006-CR, 1994 WL 462180, at *1 (Tex. App.—Dallas Aug. 23, 1994) (not designated for publication), which we discuss below.[16] The prosecutor relied on *Albright I* to

---

[16]The Court of Criminal Appeals reversed *Albright I* on petition for discretionary review and remanded the case to the Dallas court. *See Albright v. State* (*Albright II*), No. 05-92-00006-CR, 1995 WL 500391, at *1 (Tex. App.—Dallas Aug.

19

support the State's argument that when search warrants executed on the same location are based on different offenses, are supported by different probable cause affidavits, and describe different items to be seized, Article 18.01(d) does not invalidate the second warrant. The prosecutor argued that after the May search warrant issued, the police had done the controlled buy with Broadnax, new crimes— the hydrocodone and alprazolam transfers to Broadnax—were committed, and money laundering was not mentioned at all in the June search warrant affidavit. The prosecutor stated, "I would argue that this is not a subsequent search warrant," but rather another search warrant that "just happens to be on the same location."

The trial court concluded that "subsequent" in the statute modified "the crime that you're looking for" and that the statute's intent was that with a new crime, a new warrant can be issued without being considered a "subsequent warrant."

## B. Standard of review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact

23, 1995, pet. ref'd) (not designated for publication). In *Albright II*, the Dallas court noted that the Court of Criminal Appeals had refused 22 of the appellant's 24 points but had vacated the Dallas court's judgment and remanded the case for the Dallas court to address the merits of two points that the Dallas court had concluded were unpreserved. *Id.* One of those points involved suppression, *see id.* at *2–4, but not the one discussed in *Albright I* upon which the State relies.

questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). When reviewing the trial court's ruling on a suppression motion, we must view the evidence in the light most favorable to the ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007); *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).

To suppress evidence lawfully obtained by a warrant based on an alleged omission in the affidavit supporting the warrant, the defendant must establish by a preponderance of the evidence that the omission was made knowingly, intentionally, or with reckless disregard for the truth in an attempt to mislead the magistrate. *Darby v. State*, 145 S.W.3d 714, 722 (Tex. App.—Fort Worth 2004, pet. ref'd).

## C. Credibility

Megwa argues that Investigator Fleming relied on Broadnax's credibility in attempting to establish probable cause for the search and thereby demonstrated a reckless disregard for the truth when she failed to disclose that Broadnax was being rewarded for her cooperation through dismissal of her traffic violation and by not being charged with possession of a controlled substance without a prescription; that Broadnax "suffered from numerous mental illnesses including drug addiction[,] severe depression[,] and schizophrenia"; and that Investigator Fleming "had no prior experience with Broadnax as an informant by which to determine her reliability."

21

However, the credibility at issue in the suppression hearing belonged primarily to Investigator Fleming as the author of the affidavit in question.

The trial court considered Investigator Fleming's credibility during her testimony and determined that no omissions had been made knowingly, intentionally, or with a reckless disregard for the truth in an attempt to mislead the magistrate judge. We may not second guess that credibility determination. *See Wiede*, 214 S.W.3d at 24–25 (stating, in the suppression context, that the trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony).

Further, as the magistrate judge pointed out during his testimony about the affidavit, Broadnax had been identified by name in the affidavit and the credibility of her allegations was supported by other facts, which were corroborated in the warrant:

- Investigator Fleming had made several prescription fraud arrests involving the pharmacy;

- Megwa was the pharmacy's only pharmacist;

- Megwa had previously been arrested in May 2014 for diversion of a controlled substance, and the pharmacy had been searched at that time;

- Alprazolam and hydrocodone are controlled substances;

- Louis Bell had a prescription for alprazolam and hydrocodone based on the dispensing report obtained in the May 20, 2014 search;

- The police provided the U.S. currency for Broadnax's purchase of hydrocodone without a prescription.

As the magistrate judge testified, such corroboration is what, in his experience, made

the affidavit credible. Accordingly, we overrule this portion of Megwa's sole issue.

## D.  Article 18.01(d)

We begin this portion of our analysis with a review of the rules applicable to

statutory construction as set out by the Court of Criminal Appeals.

### 1.  Statutory construction rules

According to the Court of Criminal Appeals, we are to apply a plain-language,

textualist approach with regard to statutory construction:

> When we interpret statutes, we seek to effectuate the collective intent or purpose of the legislators who enacted the legislation.  In so doing, we necessarily focus our attention on the literal text of the statute in question and attempt to discern the fair, objective meaning of the text at the time of its enactment.  We follow this principle because (1) the text of the statute is the law; (2) the text is the only definitive evidence of what the legislators had in mind when the statute was enacted into law; and (3) the Legislature is constitutionally entitled to expect that the Judiciary will faithfully follow the specific text that was adopted.  Our duty is to try to interpret the work of our Legislature as best we can to fully effectuate the goals they set out.  Legislative intent isn't the law, but discerning legislative intent isn't the end goal, either.  The end goal is interpreting the text of the statute.
>
> In interpreting the text of the statute, we must presume that every word in a statute has been used for a purpose and that each word, phrase, clause, and sentence should be given effect if reasonably possible. We do not focus solely upon a discrete provision; we look at other statutory provisions as well to harmonize provisions and avoid conflicts. When we are dealing with the passage of a particular act, . . . we look to the entire act in determining our Legislature's intent with respect to a specific provision.  And we construe a statute that has been amended as if it had originally been enacted in its amended form, mindful that the Legislature, by amending the statute, may have altered or clarified the meaning of earlier provisions.  "Time-honored canons of

23

interpretation, both semantic and contextual, can aid interpretation, provided the canons esteem textual interpretation."

But, most importantly, we read words and phrases in context and construe them according to rules of grammar and common usage. When a particular term is not legislatively defined but has acquired a technical meaning, we construe that term in its technical sense. We may consult standard or legal dictionaries in determining the fair, objective meaning of undefined statutory terms, and legal dictionaries to determine the meaning of undefined legal terms.

When the language of the statute is ambiguous or leads to absurd results, we may consider extra-textual factors in construing the statute. A statute is ambiguous when it may be understood by reasonably well-informed persons to have two or more different interpretations. For example, the statutory use of the word "table" can be ambiguous if it is impossible to tell from context whether the statute refers to a breakfast table or a numerical chart. Extra-textual factors that we may consider to resolve ambiguity include: (1) the object sought to be attained by the Legislature; (2) the circumstances under which the statute was enacted; (3) the legislative history; (4) the common law or former statutory provisions, including laws on the same or similar subjects; (5) the consequences of a particular construction; (6) the administrative construction of the statute; and (7) the title or caption, preamble, and any emergency provision. Statutory construction is a question of law that we review *de novo.*

*Watkins v. State*, 619 S.W.3d 265, 271–73 (Tex. Crim. App. 2021) (footnotes omitted).

Only if the statute is ambiguous or leads to absurd results can we look beyond the text. *Id.* at 273.

## 2. "Literal Text"

Article 18.01(d) restricts what kind of property or items may be seized and how a second search warrant may be obtained, stating,

Only the specifically described property or items set forth in a search warrant issued under Article 18.02(a)(10) or property, items or

24

contraband enumerated in Article 18.02(a)(1), (2), (3), (4), (5), (6), (7), (8), (9), or (12) may be seized. A subsequent search warrant may be issued pursuant to Article 18.02(a)(10) to search the same person, place, or thing subjected to a prior search under Article 18.02(a)(10) only if the subsequent search warrant is issued by a judge of a district court, a court of appeals, the court of criminal appeals, or the supreme court.

Tex. Code Crim. Proc. Ann. art. 18.01(d).

Merriam-Webster defines "subsequent" as an adjective meaning "following in time, order, or place," https://www.merriam-webster.com/dictionary/subsequent (last visited August 30, 2021), while it defines "prior" as an adjective meaning "earlier in time or order" or "taking precedence (as in importance)," https://www.merriam-webster.com/dictionary/prior (last visited August 30, 2021). *See Watkins*, 619 S.W.3d at 272–73 (providing for consultation of standard dictionaries to determine the fair, objective meaning of undefined statutory terms). Merriam-Webster lists four entries for "same" as an adjective: (1) "resembling in every relevant respect" or "conforming in every respect"; (2) "being one without addition, change, or discontinuance: IDENTICAL" or "being the one under discussion or already referred to"; (3) "corresponding so closely as to be indistinguishable"; and (4) "equal in size, shape, value, or importance." https://www.merriam-webster.com/dictionary/same (last visited August 30, 2021).

Thus, using the plain language approach, under Article 18.01(d), the issuance of a search warrant under Article 18.02(a)(10) to search the identical person, place, or thing subjected to a previous search warrant issued under Article 18.02(a)(10) can

25

occur only if the second Article 18.02(a)(10) search warrant is issued by the specific judges authorized to do so in the statute. To understand why Article 18.02(a)(10) is the focus of this subsection, we must examine the context of both Article 18.01(d) and Article 18.02(a)(10).

### 3. Context

Article 18.01(d) is part of Chapter 18 of the Code of Criminal Procedure, which governs search warrants. *See generally* Tex. Code Crim. Proc. Ann. arts. 18.01–.24. Article 18.01(d) specifically references Article 18.02(a)(10), under which a search warrant may be issued to search for and seize "property or items, except the personal writings by the accused, constituting evidence of an offense or constituting evidence tending to show that a particular person committed an offense." *Id.* art. 18.02(a)(10).

"Search warrants issued pursuant to subdivision 10 of Article 18.02 are 'evidentiary' search warrants and subject to a number of requirements more stringent than those applicable to other search warrants." 40 George E. Dix et al., *Texas Practice: Criminal Practice & Procedure* § 9:9 (3d ed. 2011) (noting that the basis for the Legislature's concern in making the distinction is unclear but likely because it considered such warrants as particularly susceptible to abuse). The stricter standards apply because of the distinction between "mere evidence" under Article 18.02(a)(10)—which "encompasses items or things that are subject to seizure *only* because they are of potential evidentiary value to the state," i.e., relevant to whether a crime was committed or the perpetrator's identity—and items "subject to seizure for

26

some *other* reason—such as [their] status as contraband or fruits or instrumentalities of crimes," under the other subsections of Article 18.02. *Id.*; *see LopezGamez v. State*, 622 S.W.3d 445, 456 (Tex. App.—Fort Worth 2020, pet. ref'd) (stating that "mere evidence" refers only to those items sought and described in a warrant issued under Article 18.02(a)(10)).[17]

Article 18.02(a)(10) is "a catch-all section that applies only when the other articles do not." *State v. Young*, 8 S.W.3d 695, 698–99 (Tex. App.—Fort Worth 1999, no pet.) (holding that warrant was properly issued under Article 18.02(a)(9) when the gun sought was alleged to be the instrument of the crime and remaining items were properly seized as "plain view" evidence under subsections (a)(1)–(9) and (12), which can be properly seized when not specifically mentioned in the warrant).

In contrast to subsection (a)(10), subsections (a)(1) through (a)(9), and (a)(12) of Article 18.02, which sets out the grounds for issuance of a search warrant, pertain to the search and seizure of other items that are more obviously connected to illegality or crime, such as property acquired by theft, property specially designed for or commonly used in committing crime and other such instruments, weapons, gambling equipment, obscene materials, drugs and drug paraphernalia, and contraband, while subsection (a)(11) permits the search and seizure of persons, and subsections (a)(13)

---

[17]For a discussion of the evolution of Articles 18.01 and 18.02, see *Reeves v. State*, 969 S.W.2d 471, 480–84 (Tex. App.—Waco 1998, pet. ref'd) (op. on reh'g), which traces the statutes from 1965 forward, including the addition of Article 18.02(a)(10)'s "mere-evidence" provision.

and (a)(14) pertain to cell phones and data held in electronic storage. *See* Tex. Code Crim. Proc. Ann. art. 18.02(a)(1)–(9), (a)(11)–(14); *see also Foreman v. State*, 613 S.W.3d 160, 164–65 (Tex. Crim. App. 2020) ("Other provisions of Article 18.02(a) authorize the issuance of warrants to search for and seize, for example, stolen property, arms and munitions, weapons, drugs, and instrumentalities of crime."), *cert. denied*, No. 20-1445, 2021 WL 1951874 (U.S. May 17, 2021).

Article 18.01 itself is full of limitations. *See generally* Tex. Code Crim. Proc. Ann. art. 18.01(a)–(j). Subsection (a) of Article 18.01 defines "search warrant," subsection (b) sets out the requirement of setting forth sufficient facts to establish probable cause, and subsection (b-1) establishes how a magistrate may consider information submitted other than in a sworn affidavit. *Id.* art. 18.01(a), (b), (b-1)(1)–(5).

Subsection (c) of Article 18.01 sets out generally when an "evidentiary" warrant may be issued under Article 18.02(a)(10) and restricts the type of judge who may issue it:

> A search warrant may not be issued under Article 18.02(a)(10) unless the sworn affidavit . . . sets forth sufficient facts to establish probable cause: (1) that a specific offense has been committed, (2) that the specifically described property or items that are to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense, and (3) that the property or items constituting evidence to be searched for or seized are located at or on the particular person, place, or thing to be searched. Except as provided by Subsections (d), (i),[18] and (j),[19] only a judge of a municipal court of

---

[18]Subsection (i) was amended in 2017 as a legislative fix for Chambers County and has no bearing on this appeal other than its reiteration that "[t]his subsection is not applicable to a subsequent search warrant under Article 18.02(a)(10)." Act of May

28

record or a county court who is an attorney licensed by the State of Texas, a statutory county court judge, a district court judge, a judge of the Court of Criminal Appeals, including the presiding judge, a justice of the Supreme Court of Texas, including the chief justice, or a magistrate with jurisdiction over criminal cases serving a district court may issue warrants under Article 18.02(a)(10).

*Id.* art. 18.01(c); *see LopezGamez*, 622 S.W.3d at 456 (explaining that Article 18.02(a)(10)'s catchall provision does not grant unrestrained power but rather is limited by Article 18.01(d)); *Lindley v. State*, 736 S.W.2d 267, 275 (Tex. App.—Fort Worth 1987, pet. ref'd, untimely filed) ("It is readily apparent that [S]ection [18.02(a)([10])] is reserved for evidentiary items which do not fit any of the categories included in the first nine sections."). Other subsections of Article 18.01 likewise restrict its scope and application.[20]

---

24, 2017, 85th Leg., R.S., ch. 1035, § 1, 2017 Tex. Sess. Law Serv. 4075, 4075 (current version at Tex. Code Crim. Proc. Ann. art. 18.01(i)); *see* House Committee on Criminal Justice, Bill Analysis, Tex. H.B. 1727, 85th Leg., R.S. (2017), https://capitol.texas.gov/tlodocs/85R/analysis/pdf/HB01727E.pdf#navpanes=0 (last visited August 30, 2021).

[19]Subsection (j) pertains to issuance of a search warrant to collect blood specimens and therefore has no bearing on the resolution of this appeal.

[20]Subsection (e) of Article 18.01 sets out some other clear prohibitions with regard to search warrants for media offices:

A search warrant may not be issued under Article 18.02(a)(10) to search for and seize property or items that are not described in Article 18.02(a)(1), (2), (3), (4), (5), (6), (7), (8), or (9) and that are located in an office of a newspaper, news magazine, television station, or radio station, and in no event may property or items not described in Article 18.02(a)(1), (2), (3), (4), (5), (6), (7), (8), or (9) be legally seized in any

### 4. Case law

Few cases have interpreted Article 18.01(d), and none have been directly on point with the facts of the instant case. We begin with *Albright I* and then review the remainder in chronological order.

In *Albright I*, the appellant raised two dozen points in the appeal of his conviction for the murder of a prostitute who was found dead after two other prostitutes had been murdered in the same area in the same way. 1994 WL 462180, at *1. Among his arguments, the appellant complained that items seized from his

---

> search pursuant to a search warrant of an office of a newspaper, news magazine, television station, or radio station.

Tex. Code Crim. Proc. Ann. art. 18.01(e). For the issuance of a search warrant to photograph an injured child, *see id.* art. 18.021, subsection (f) of Article 18.01 sets out additional specific requirements for establishing probable cause. *Id.* art. 18.01(f). Subsections (g) and (h) of Article 18.01 set out limitations on issuance of search warrants under Article 18.02(a)(12), including what kind of judge may issue them, and Subsection (j) provides that any magistrate who is a Texas-licensed attorney may issue a search warrant under Article 18.02(a)(10) to collect a blood specimen from someone who has been arrested for driving while intoxicated and who refuses to submit to a breath or blood alcohol test. *Id.* art. 18.01(g), (h), (j).

Other portions of Chapter 18 set out the required contents of a search warrant issued under Chapter 18, Chapter 18A ("Detection, Interception, and Use of Wire, Oral, and Electronic Communications"), or Chapter 18B ("Installation and Use of Tracking Equipment; Access to Communications"). *Id.* arts. 18.04, 18a.001–.553, 18b.001–.553. Under Article 18.05, a magistrate may issue to a fire marshal, health officer, or code enforcement official a search warrant to inspect a specified premises for fire or health hazards, unsafe building conditions, or violations of any fire, health, or building regulations, statutes, or ordinances. *See id.* art. 18.05. Chapter 18, accordingly, appears to be a highly regulated system.

home[21] should have been suppressed because police had previously searched his home under an earlier warrant. *Id.* at *7. At the time, Article 18.01(d) provided that "subsequent search warrants may not be issued pursuant to article 18.02(10) to search the same place subjected to a prior search under that section." *Id.* at *8.

The Dallas court observed that the two search warrants executed at the appellant's home were based on different offenses, were supported by different probable cause affidavits, and described different items to be seized. *Id.* That is, when the police executed the first search warrant, the affidavit stated that there was probable cause to believe the appellant had tried to murder a woman by threatening her with a gun and cutting her with a knife, and it authorized the police to seize only a "medium size dark colored handgun and a small cutting instrument." *Id.* The second warrant's affidavit stated that there was probable cause to believe that the appellant had murdered three other women and authorized police to seize ten items that were not previously listed in the first search warrant. *Id.* The court concluded that Article 18.01(d) did not apply to prohibit the later search based on these differences. *Id.* The court also noted, however, that the first search warrant had been based on searching for and seizing implements and instruments used in the commission of a crime as described in Article 18.02(9), which prevented Article 18.01(d)'s application to prohibit the second search anyway. *Id.*

_____

[21]Police had searched several properties owned by the appellant and had seized a number of items from those properties. *Albright I*, 1994 WL 462180, at *2.

31

Similar to the Dallas court's denying suppression of evidence in *Albright I*, the

San Antonio court also denied suppression of evidence gathered under a subsequent

search warrant, explaining:

> We do not believe the Legislature intended to prevent the State from applying for a subsequent search warrant to seize evidence previously observed while executing an earlier search warrant. We believe the evil sought to be prevented by the Legislature was repeated general exploratory searches of the same person, place or thing so as to constitute harassment. The execution of a subsequent search warrant to seize a particular item already observed would not constitute a search in our opinion, particularly when the item sought to be seized is one kept in plain view, negating an expectancy of privacy.

*Gordon v. State*, 640 S.W.2d 743, 755 (Tex. App.—San Antonio 1982, no pet.), *abrogated*

*on other grounds by Reed v. State*, 744 S.W.2d 112, 125 n.10 (Tex. Crim. App. 1988).[22]

In *Lopez v. State*, the Eastland court relied on the *Gordon* court's reasoning to

reach a similar conclusion. No. 11-94-005-CR, 1995 WL 17212285, at *3 (Tex.

App.—Eastland Sept. 14, 1995, no pet.) (mem. op., not designated for publication).[23]

---

[22]In *Gordon*, the subsequent warrant was based on knowledge that a police officer had garnered in a previous search under a warrant. 640 S.W.2d at 755.

[23]In *Lopez*, the police had learned from the appellant's sister on June 28 that he had told her that he had killed the victim at his home by cutting her throat with a knife and that the knife was hidden under the bedroom carpet. 1995 WL 17212285, at *2. Regarding the June 29 search warrant, the court stated, "It is clear that this was an evidentiary search warrant issued pursuant to" Section 18.02(a)(10). *Id.*

The next day, the appellant admitted in a written statement to police that he had killed the victim by cutting her throat with a box cutter and told them that the box cutter was still inside his home. *Id.* at *3. One of the officers who had participated in the first search recalled having seen box cutters during the search, but they had been left unseized because no one at that time believed they were connected

In *Lopez*, the appellant complained that the trial court had erred by denying his motion to suppress under Article 18.01(d) when the police searched his house on June 29, 1992, pursuant to a search warrant and then searched it again pursuant to another search warrant on July 9, 1992. *Id.* at *2.

The Eastland court agreed with the San Antonio court that "the evil sought to be prevented by the [L]egislature in enacting Article 18.01(d) was repet[itive] general exploratory searches of the same person, place, or thing so as to constitute harassment," but that a subsequent search warrant issued under a different subsection of 18.02—section 18.02(a)(9)—was not a general exploratory search warrant and therefore not prohibited by Article 18.01(d). *Id.* at *3; *cf. State v. Flores*, 856 S.W.2d 614, 615 (Tex. App.—Eastland 1993, pet. ref'd) (upholding suppression when then-Article 18.01(d) stated that subsequent search warrants could not be issued under subsection (10) to search the same person, place, or thing subjected to a prior search under subsection (10)).

In 1996, the Court of Criminal Appeals addressed the question of subsequent searches in *Ramos v. State*, 934 S.W.2d 358, 364 (Tex. Crim. App. 1996).[24] Although

───────────────

with the crime. *Id.* The police obtained the second warrant on July 9 to secure the box cutter, knife, and shovel as "implements and instruments" used in the crime's commission under Article 18.02(a)(9) based on what the appellant himself had told them about what he had used to kill the victim and where those items were located. *Id.*

[24]In *Ramos*, the appellant was accused of murdering his wife and two youngest children. 934 S.W.2d at 360. The appellant had executed a written consent to search

33

the opinion in *Ramos* was issued after the statutory amendment, the court construed and applied the earlier version of the statute, which—under its plain language—prohibited the issuance of any second warrants under Article 18.02(10). *Id.*

In *Ramos*, the appellant complained, among other things, that the second search warrant was invalid under Article 18.01(d), which at the time prohibited the issuance of a second search warrant under Article 18.02(10). *Id.* at 364. The court noted that the "any and all evidence relating to a homicide" language "clearly constitutes an attempt to conduct a second evidentiary search," but that the affidavit also requested

---

his home that led to the recovery of no useful evidence, and then he executed a written consent to search his post office box, which revealed a phone bill and a welfare check. *Id.* at 361. The welfare check conflicted with the appellant's claim that his family had fled to Mexico because they were guilty of welfare fraud. *Id.* at 361–63. He also gave other conflicting accounts of their whereabouts. *Id.* at 361. A search warrant to search the appellant's home was later issued for "blood, clothing containing blood, a weapon and/or object used in the commission of a murder, and any and all evidence relating to a homicide and/or a kidnapping." *Id.* During the search, the police saw two hammers, discovered sacks of women's and children's clothes and toys in the attic, noticed that the bathroom floor looked newly tiled, and conducted various types of blood testing throughout the house. *Id.* at 362. They took photographs of some of the items that they saw. *Id.* at 364.

The day after the first search, the appellant signed a written statement in which he claimed to have found the bodies when he came home and then buried them under the bathroom floor. *Id.* at 362. Police obtained another search warrant for the home, seeking to search for the bodies and "any and all evidence relating to a homicide." *Id.* The affidavit in support of the second warrant recited all of the earlier probable cause allegations and added the blood evidence retrieved in the first search and the statements made by the appellant. *Id.* Pursuant to the second warrant, the police seized the bodies, two pipe wrenches, two soil samples, a pair of scissors, a ballpeen hammer, broken tile, burnt pieces of rope, a putty knife, a plastic container of dried cement, tiles, and half of a post hole digger. *Id.*

a search for and seizure of the victims' bodies, i.e., "persons" under subsection (11) of Article 18.02. *Id.* The court stated that if those bodies counted as "persons" under the statute, then the impermissible parts of the warrant could be severed. *Id.*

In construing "persons," the court first observed that "persons" as used in the statute did not have a clear and unambiguous meaning, and then examined the circumstances of the statute's enactment, its legislative history, and its title, preamble, and emergency provision, all to no avail, before turning to the object sought by the statute and the consequences of particular constructions. *Id.* at 364–65.

The court noted that other provisions of Article 18.02 permitted a search for the fruits of a crime and that the "persons" provision might serve a similar function in that it would clearly permit a warrant to be issued to search for kidnapping victims who were still alive. *Id.* at 365. In both kidnapping and murder, the court reasoned, "the human victim is the 'fruit' of the criminal activity," and a narrow construction to only live persons "would have the paradoxical effect of conferring greater protection upon one who murders his victims than upon one who holds his victims alive for ransom." *Id.* Considering the potential paradox, the court determined that "persons" under subsection (11) referred to both the living and the dead. *Id.* The court then addressed whether the remaining items seized were either "plain view" or harmless and overruled the appellant's arguments. *Id.* at 365–66.

In considering the applicable case law, we must also note that how a warrant is classified is a question of law determined by the warrant's language and by the

35

statements made in the supporting affidavit. *Jennings v. State*, 531 S.W.3d 889, 893 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd); *see Young*, 8 S.W.3d at 697–98 ("[T]he classification of the warrant and the propriety of the resulting search and seizure are legal determinations."). If a warrant authorizes a search for both "mere evidence" and items listed under another ground for search and seizure, then the warrant is not a mere-evidentiary search warrant. *Jennings*, 531 S.W.3d at 893.[25]

### 5. Absurdity and legislative history

At least one commentator has observed that construing Article 18.01(d) strictly by its plain language would inevitably lead to an absurd result. 40 Dix et al., *supra*, § 9:13. According to Professor Dix, to correct the "quite confusing language" in the earlier version of Article 18.01(d), in 1995, the Legislature replaced the total prohibition against subsequent evidentiary warrants for the same person, place, or thing with a special limit—which judges could issue them.[26] *Id.* He then identifies an

---

[25]In *Jennings*, a child-pornography case, the police sought a warrant to seize computers, related equipment, software, the forensic examination of any devices seized, utility bills, rent receipts, addressed envelopes, keys to the premises, and data or images of persons who appeared to be under the age of 18 engaged in sexual acts or posed in a manner to elicit a sexual response. 531 S.W.3d at 891, 893 nn. 2–3. The court concluded that the warrant was issued under Article 18.02(a)(8) and thus was not a mere evidentiary warrant under Article 18.02(a)(10), even though some of the items sought to be seized—like the utility bills—were not "property the possession of which is prohibited by law." *Id.* at 893.

[26]The same commentator also pointed out that the special requirement is triggered by a search pursuant to an evidentiary warrant, so issuing the evidentiary warrant *without* a search will not trigger it, nor will a search conducted under a warrant that is not an *evidentiary* warrant. 40 Dix et al., *supra*, § 9:13. He further noted that the

unintended consequence and potential absurdity of a plain-language interpretation of

the revised Article 18.01(d):

> As it applies . . . the requirement, once triggered, is unqualified and absolute. On its face, for example, the statute seems to say that once premises—a "place"—are searched pursuant to an evidentiary warrant, officers must obtain any subsequent evidentiary warrant for those premises from a judge on the short statutory list. This requirement appears to apply even if years have passed, the premises have been sold, and the suspects now occupying the premises have no relationship to those who were the target of the previous search pursuant to an evidentiary warrant. It is unlikely that the [L]egislature intended that the requirement apply this broadly, yet the statute provides no reasonable way of limiting the requirement.

*Id.* The potential absurdity that Professor Dix reveals is that, for example, under

Article 18.01(d), the police could search a place for methamphetamine but then, ten

years later, could not search the same property for a dead body if the wrong judge was

asked to sign the search warrant.

We first note that such a hypothetical absurdity is not present under the facts

of this case. Instead, the second affidavit here involved a continuation of an ongoing

investigation over the course of weeks—not months—and did not involve crimes that

differ in their general manner and means of commission.

---

prohibition is only against the issuance of subsequent *evidentiary* warrants—i.e., warrants under Article 18.02(a)(10)—and no limit is imposed upon the issuance or execution of search warrants authorized by other provisions of Article 18.02. *Id.*; *see also Thomas v. State*, 352 S.W.3d 95, 104–05 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (op. on reh'g) (holding that when initial warrant was issued under Health and Safety Code Section 821.022, Article 18.01(d)'s subsequent search warrant requirements did not apply).

In considering Professor Dix's observation, we follow the guidance of the Court of Criminal Appeals in *Watkins*, by looking at the predecessor statute and the legislative history. *See* 619 S.W.3d at 272–73.

As discussed above, Article 18.01(d)'s predecessor statute did not allow for the issuance of a subsequent search warrant under Article 18.02(a)(10) at all:

> Only the specifically described property or items set forth in a search warrant issued under Subdivision (10) of Article 18.02 of this code or property or items enumerated in Subdivisions (1) through (9) of Article 18.02 of this code may be seized. Subsequent search warrants may not be issued pursuant to Subdivision (10) of Article 18.02 of this code to search the same person, place, or thing subjected to a prior search under Subdivision (10) of Article 18.02 of this code.

Act of May 12, 1977, 65th Leg., R.S., ch. 237, 1977 Tex. Gen. Laws 640, 640–41 (amended 1995) (current version at Texas Code Crim. Proc. Ann. art.18.01(d)). But in 1995, the Legislature tempered that prohibition by providing that a subsequent search warrant could be issued under Article 18.02(a)(10) but only if issued by a particular type of judge. Act of May 27, 1995, 74th Leg., R.S., ch. 670, § 1, 1995 Tex. Gen. Laws 3642, 3642–43; *Ibarra v. State*, 11 S.W.3d 189, 192 & n.4 (Tex. Crim. App. 1999).[27]

---

[27]In the bill analysis of the 1995 amendment, the Senate Committee on Criminal Justice noted that under the then-existing statute, the State could not seek additional search warrants for the same person, place, or thing for evidence of a crime once an evidentiary search warrant had been executed, "regardless of whether probable cause exists for the subsequent search," hindering law enforcement's ability to seek a second or subsequent search warrant when (1) new evidence was uncovered after the execution of the first warrant; (2) through honest mistake or accident, evidence was lost, contaminated, or otherwise rendered unusable (specifically referencing blood samples); (3) new technology enabled testing unavailable when the first warrant was executed; and (4) the initial evidentiary search warrant revealed

Magistrates are not included in the type of judge authorized to issue a subsequent search warrant under Article 18.02(a)(10). *See* Tex. Code Crim. Proc. Ann. art. 18.01(d).

### 6. Analysis

Megwa argues that the statute's plain language prohibited the magistrate judge here from issuing the "subsequent" search warrant under Article 18.02(a)(10) to search the same person, place, or thing subjected to the prior search under Article 18.02(a)(10). The State responds by referring us to *Albright I* and contending that because the June search warrant involved a new, separate offense from the May search warrant, and because the June search warrant was supported by separate probable cause, it was not a "subsequent" warrant under the statute.

### a. The Warrants

The May warrant for the pharmacy did not separately identify the subsections justifying the search, but the incorporated affidavit listed subsections 18.02(a)(1), (a)(7), (a)(8), (a)(9), (a)(10), and (a)(12). The return filed the next day listed the following as having been seized: U.S. currency, prescription hard copies, miscellaneous documents, a wallet belonging to an unknown person, identification, a

---

evidence of a crime unanticipated or unenumerated in the search warrant. Senate Comm. on Criminal Justice, Bill Analysis, Tex. S.B. 1349, 74th Leg., R.S. (1995), https://capitol.texas.gov/tlodocs/74R/analysis/html/SB01349H.htm (last visited August 30, 2021). The amendment was added to provide "limited circumstances" under which a subsequent evidentiary search warrant under Article 18.02(a)(10) could be sought. *Id.*

39

prepaid Visa gift card, a cell phone, a surveillance system hard drive with remote, a Mercedes Benz e500, a Toyota Camry, and computer towers.

The June warrant for the pharmacy likewise did not separately identify the subsections justifying the search, but the incorporated affidavit listed subsections 18.02(a)(8), (a)(9), (a)(10), and (a)(12). The return filed the next day reported that police had seized "hard copy prescriptions, Cell phone, a quantity of US currency, Miscellaneous documents relating to prescriptions."

Setting aside for a moment subsection (a)(10), subsections 18.02(a)(8), (a)(9), and (a)(12) cover, respectively, "any property the possession of which is prohibited by law," "implements or instruments used in the commission of a crime," and "contraband subject to forfeiture under Chapter 59 of this code." *See* Tex. Code Crim. Proc. Ann. art. 18.02(a)(8), (9), (12).[28] If provisions besides subsection (a)(10) apply, depending on the circumstances, this would prevent the application of Article 18.01(d)'s prohibition. *See Jennings*, 531 S.W.3d at 893; *see also Ramos*, 934 S.W.2d at 364 (severance); *Lopez*, 1995 WL 17212285, at *3 (holding second search not prohibited when second warrant issued under Article 18.02(a)(9)'s predecessor). Therefore, we begin our analysis by looking more closely at the warrants and

_____

[28]Subsection 18.02(a)(12) is subject to additional requirements, i.e., that the "specifically described property or items that are to be searched for or seized constitute contraband as defined in Article 59.01 of this code and are located at or on the particular person, place, or thing to be searched." Tex. Code Crim. Proc. Ann. art. 18.01(g).

affidavits—or any part of them—to determine if they fall entirely under subsection (a)(10).[29] *See Young*, 8 S.W.3d at 697–98 (referencing the classification of the warrant as a legal determination).

The May affidavit, which sought permission to search for and seize "all contraband and evidence" pertaining to the diversion of controlled substances under Health and Safety Code Section 481.1285, and to money laundering under Penal Code Section 34.02, alleged to have been committed by Megwa and her husband, listed 30 categories of items with regard to the pharmacy, any locked safes found inside the pharmacy, and three specifically identified vehicles. It contained a four-and-a-half-page recitation of probable cause regarding the use of the vehicles to deliver drugs, the quantity of hydrocodone pills and other controlled substances moving through the pharmacy, and how Megwa and her husband had been using the pharmacy's cash, including their purchasing of at least one of the vehicles with those funds.

The June affidavit, to search for and seize "all contraband and evidence" pertaining to the diversion of controlled substances under Health and Safety Code Section 481.1285, listed 24 categories of items in connection with 10 probable cause paragraphs alleging that Megwa had sold hydrocodone and alprazolam prescribed for Louis Bell to Broadnax for cash. Of the 24 items listed in the June affidavit, 22 are

---

[29]Megwa argues that the second search warrant "was issued at least in part pursuant to Article 18.02(a)(10)," but she does not identify which parts and does not otherwise explain how the other listed articles—(a)(8), (a)(9), and (a)(12)—do not prevent the application of Article 18.01(d).

41

the same as those listed in the May affidavit: financial records, telephone records, cell phones or other means of personal communication,[30] identification documents, financial instruments, calendars and diaries, email, keys, documents pertaining to safe deposit boxes or property storage units, documents pertaining to real or personal property ownership, all U.S. or foreign currency and coins,[31] all photographs and audio or video tapes, all controlled substances and dangerous drugs kept in violation of the Health and Safety Code,[32] all computer and computer-related equipment, all computer programs and records,[33] safes and their contents, any and all prescription forms or pads, and "any other items of contraband."

This 22-item overlap in the affidavits makes sense because one of the offenses being investigated in the first affidavit—diversion of controlled substances—is the

_____

[30]A cell phone is subject to search and seizure under Article 18.02(a)(14). Tex. Code Crim. Proc. Ann. art. 18.02(a)(14).

[31]Any illegal funds obtained pursuant to the alleged offenses may have been contraband subject to forfeiture under Code of Criminal Procedure Chapter 59, subject to the probable cause requirement and specific descriptions referenced in Article 18.01(g). *See* Tex. Code Crim. Proc. Ann. arts. 18.01(g), 18.02(a)(12), 59.01(2)(B)(i) (listing as "contraband" property of any nature that is used or intended to be used in the commission of any felony under Health and Safety Code Chapter 481), (C) (listing as "contraband" the proceeds gained from the commission of a felony listed in Paragraph (A) or (B) of this subdivision).

[32]Article 18.02(a)(7) provides for the seizure of drugs. Tex. Code Crim. Proc. Ann. art. 18.02(a)(7).

[33]Article 18.02(a)(13) provides for seizure and search of electronic customer data held in electronic storage. Tex. Code Crim. Proc. Ann. art. 18.02(a)(13).

42

same type of offense as listed in the second, although the manner and means of the offense's commission is more specific in the June affidavit, sets out different facts, and occurred only after the May search. This distinction is highlighted by the two different, additional items listed in the June affidavit: "Prescription bottle(s) or prescription label(s) bearing name Louis Bell," and "Pharmacy records."

In contrast, the May affidavit sought nine additional items: telephone answering machines and voice mail (including messages), corporate records, past and future travel documents and records, wire transfer and other fund transmission documents and records pertaining to U.S. currency or foreign funds, federal and state tax records, all items classified as controlled substances on the DEA Schedule of Controlled Substances I–V, a 2006 black Mercedes Benz e500, a 2008 black Mercedes Benz 450, and a black 1998 Toyota Camry.[34]

Items to be seized under Article 18.02(a)(10) must be "specifically described property or items." Tex. Code Crim. Proc. Ann. art. 18.01(c); *see also id.* art. 18.01(g) (requiring items that are to be searched for or seized as contraband to be specifically described). The May affidavit specifically described the DEA-Schedule controlled substances and the vehicles, while the June affidavit specifically described the Louis Bell-labeled prescription bottles and labels and "pharmacy records." Some of the "pharmacy records" were probably items "constituting evidence of an offense or

---

[34]The affidavit also identified the vehicles by their Texas license plate numbers, but we do not include them because they are not pertinent to our analysis.

constituting evidence tending to show that a particular person committed an offense" under Article 18.02(a)(10), but some equally might also have been "implements or instruments used in the commission of a crime" because Megwa was accused of diverting prescription medicines from the person for whom they were prescribed. *See id.* art. 18.02(a)(9), (a), (10). And as footnoted above, many of the overlapping items were subject to seizure under other provisions of Article 18.02. At best, then, neither affidavit was purely "evidentiary" under Articles 18.02(a)(10) and 18.01(c).

### b. Conclusion

In her reply brief, Megwa reminds us that the searches "were sought by the same police officer as part of an ongoing criminal investigation, merely one month apart, and pertained to the same alleged criminal activity, namely a pharmacist illegally dispensing a controlled substance." She argues that we should "apply a common sense understanding of 'subsequent' search and suppress the evidence because the second search was not authorized by the proper judicial authority."

To the extent that both warrants could be considered entirely "mere evidentiary" warrants under subsection (a)(10), we think that the flexible approach presented by our sister courts in *Albright I* and *Gordon* presents the best resolution to the "subsequent search warrant" language that would otherwise lead to absurd results. That is, if the Legislature's goal was to prevent repeated and harassing general exploratory searches of the same person, place, or thing, then a specific search for specific items relating to a new offense, supported by new probable cause allegations,

44

should not be foreclosed merely because the officer asks the wrong judge for the warrant.

While it is the prerogative of the Court of Criminal Appeals to determine where the line should be drawn, in our view, based on the limited case law and interpretive commentary available to us, the line here should be drawn as the trial court drew it: the subsequent offense occurred after the original search and the sponsoring affidavit sought some specific, distinct items of evidence that were not only unrelated to the May search but also unknown at the time of the May search.[35]  And when, as here, a warrant is not purely "evidentiary" under Article 18.02(a)(10), Article 18.01(d)'s "subsequent search warrant" restrictions do not necessarily foreclose the admission of the evidence.  *See Young*, 8 S.W.3d at 698–99; *Lindley*, 736 S.W.2d at 275; *see also Ramos*, 934 S.W.2d at 364; *Jennings*, 531 S.W.3d at 893.  Accordingly, we conclude that the trial court did not err by denying Megwa's motion to suppress, and we overrule the remainder of her sole point.

## IV.  Conclusion

Having overruled Megwa's sole point, we affirm the trial court's judgment.


/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

---

[35]Further, the record reflects—as set out above—that the subsequent warrant was not issued entirely under subsection (a)(10).

45

Publish
Tex. R. App. P. 47.2(b)

Delivered:  September 2, 2021